[Cite as *State v. Metz*, 2019-Ohio-4054.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                           :          Nos. 107212, 107246, 107259, and 107261

ANTHONY METZ, ET AL.                    :

    Defendants-Appellants.       :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** October 3, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-17-618532-C, CR-17-618532-D, CR-17-618532-A,
and CR-17-618532-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Russell S. Bensing, *for appellant* Anthony Metz; Thomas A. Rein, *for appellant* Richard A. Tenney; Joseph V. Pagano, *for appellant* Jaustin Browning; and Susan J. Moran, *for appellant* Anthony Bergant.

LARRY A. JONES, SR., J.:

**{¶ 1}**  Defendants-appellants Anthony Metz ("Metz"), Richard Tenney ("Tenney"), Jaustin Browning ("Browning"), and Anthony Bergant ("Bergant"), appeal their convictions and sentences for crimes associated with a sexual assault.[1] For the reasons that follow, we affirm their convictions, but reverse their consecutive sentences and remand for resentencing.

**Procedural History**

**{¶ 2}**  The defendants were indicted in July 2017.  In Count 1, all four defendants were charged with rape (fellatio) by force or threat of force; in Count 2, Tenney, Browning, and Bergant were charged with rape (vaginal intercourse) by force or threat of force; Count 3 charged all four defendants with kidnapping with a sexual motivation specification; Count 4 related solely to Browning, and charged pandering obscenity; and Count 5 related solely to Browning and Bergant, and charged misdemeanor assault.

**{¶ 3}**  All four defendants waived their right to a jury trial, and the matter proceeded to a bench trial.  At the close of the state's case, the defendants made a Crim.R. 29 motion for judgment of acquittal, which was denied.  The defense called

---

[1]This court sua sponte consolidated the defendants' appeals for disposition after oral argument.

two witnesses to testify. The defendants renewed their Crim.R. 29 motion at the conclusion of the defense's case; it was again denied.

{¶ 4} After its deliberations, the trial court found all four defendants guilty of the charges as indicted. The trial court sentenced Metz to ten years on the rape conviction and five years on the kidnapping conviction to be served consecutive to each other for an aggregate 15-year term. Tenney was sentenced to ten years on each of his three convictions (two counts of rape and one count of kidnapping), to be served consecutive to each other, for an aggregate 30-year term. The trial court sentenced Browning to ten years on each of the two rape counts, ten years on the kidnapping count, 12 months on the pandering obscenity count, and time served on the misdemeanor assault count; the trial court ordered the counts to run consecutive to each other for an aggregate 31-year term. Bergant was sentenced to ten years on each of the two rape counts, ten years on the kidnapping count, and time served on the misdemeanor assault; the trial court ordered the counts to run consecutive to each other for an aggregate 30-year term. The defendants were labeled Tier III sexual offenders.

**Trial Testimony**

{¶ 5} The victim in this case was a 20-year-old female, T.B. The incident giving rise to the charges occurred on April 6, 2017. At that time, T.B. had been dating C.T., a 17-year-old boy.

{¶ 6} In the week leading up to the incident T.B. was staying with her friend, D.W., in a house on Indiana Avenue in Cleveland. C.T. and D.W. are cousins

and C.T. lived in the house too; the house belonged to C.T. and D.W.'s grandmother. T.B. had been dating C.T. for about a month before the incident.

{¶ 7} The testimony demonstrated that a number of minors and young adults lived in or "hung around" the Indiana Avenue house. The adults in the home tended to occupy the upstairs portion of the house and the young people tended to occupy the downstairs portion. T.B. explained that she was staying there because she and her mother, with whom she lived, had been arguing and she wanted to get out of her mother's house for a few days.[2]

{¶ 8} C.T. was friends with the defendants. T.B. testified that she previously knew Browning, and that she met Bergant a couple of weeks before the incident when she was "hanging out" at Browning's apartment and Bergant was there. T.B. stated that she only met Tenney and Metz the day of the incident. T.B. believed that Bergant and Tenney were brothers.

{¶ 9} According to T.B.'s testimony, on April 5, the day before the incident, she and C.T. had been fighting after she confronted him about news she heard that he had been cheating on her. Specifically, she learned that he had been engaging in "multiple-partner sex" with some of his friends. T.B. testified C.T. left the house that night, but she stayed.

{¶ 10} The following day, C.T. returned to the house with the four defendants in Browning's vehicle. T.B. was on the porch, the group came onto the

---

[2]T.B.'s mother and father were divorced and lived apart from one another.

porch and C.T. said to T.B., "f--- your goddaughter," in an apparent reference to T.B.'s approximate 9-month-old goddaughter. T.B. testified that in response she hit C.T. in his face; he then put her in a chokehold and almost pushed her down the front porch steps.

{¶ 11} T.B. went into the house to get her cell phone, which she had left on a table. However, the phone was not there and several of the people in the house, including C.T. and Browning, were laughing at her. The group eventually went back outside. T.B. testified that she got into Browning's vehicle, "just joking around to make [C.T.] mad." According to T.B., this would make C.T. mad because he had specifically told her that he did not want her around Browning.

{¶ 12} The defendants followed her into the vehicle. Bergant was in the driver's seat, Browning was the front passenger, and T.B. was in the back middle, in between Tenney and Metz. T.B. testified that Bergant started driving — she did not know they were actually going to leave — and she did not have her cell phone or wallet, which were important to her. She repeatedly asked to go back to the Indiana Avenue house, but Bergant would not.

{¶ 13} As they were driving, Browning told T.B. to perform oral sex on Metz. Metz grabbed T.B.'s head and forcibly attempted to make her perform oral sex on him; he was successful for about a minute, but then T.B. was able to stop him. She specifically testified that his penis had been in her mouth. On cross-examination, T.B. admitted that Metz's penis was limp, not erect.

{¶ 14} Following Metz, Tenney then forced T.B. to perform oral sex on him; he was successful and ejaculated in her mouth. The other three defendants were laughing while this occurred. She held the semen in her mouth until they reached their destination, which was Browning's apartment, and she spit it out when she got out of the vehicle. T.B. testified that Browning was recording the sex acts on his cell phone. Browning told her that if she did not do as she was told he would show the video to other people. T.B. testified that during the course of the incident she told the defendants that she did not want to do the sex acts and asked them to take her back to the Indiana Avenue house.

{¶ 15} T.B. testified that when they arrived at Browning's apartment building they all went into Browning's apartment. T.B. testified that she went into the apartment because she was scared and she knew Browning knew where she lived. She was also not familiar with her surroundings. In the apartment, Tenney, Bergant, and Browning entered Browning's bedroom, she followed them into the bedroom, and Browning pushed T.B. on the bed. She testified that Metz did not go into the bedroom. T.B. testified that Tenney, Bergant, and Browning were "smoking a blunt, and they ashed on me," meaning they put the ashes in her hair.

{¶ 16} T.B. testified that Browning then forced her pants off and told her to engage in oral sex on Tenney; he told her that he would not take her home until she did so. Tenney grabbed her head and made her do it. After that, Tenney vaginally raped T.B. When Tenney was finished, Bergant vaginally raped her. Then T.B. was

forced to perform oral sex on Bergant. Browning was recording all of this with his cell phone.

{¶ 17} After those assaults, Tenney, Bergant, and Browning left the bedroom and T.B. put her pants back on and went out into the living room where all four defendants were. T.B. testified that upon entering the living room, she "got pushed over on the couch, and [her] face went into the couch, and they pulled [her] pants down," and one of them raped her, but she did not see who it was.

{¶ 18} T.B. testified that after the couch incident, they took her back into the bedroom, where she got pushed on the bed and Bergant vaginally raped her; he ejaculated inside her. Browning then made the other defendants leave and he forced her to perform oral sex on him and then he vaginally raped her, ejaculating inside of her and into her hair. Browning left when he was finished and brought the other defendants back into the bedroom. As T.B. was putting her pants back on, both Browning and Bergant hit her on the side of her face so hard that she lost her hearing for a couple of weeks. Further, one of the hits caused her eye to be swollen.

{¶ 19} T.B. went to the bathroom to try to clean her face, but the defendants told her to come on, they were leaving. They all got back in Browning's vehicle and T.B. asked Browning to take her to the Indiana Avenue house, but he said he would not. Browning drove T.B. to her mother's house, told her to get out, and that if she ever told anyone about what had happened, he would show the video. T.B. testified that she initially would not get out of the car because she wanted to go to the Indiana Avenue house to retrieve her belongings, but Browning told her he would not take

her there so she got out. The events described above occurred between 1:00 p.m. and 3:00 p.m.

{¶ 20} T.B.'s cousin, with whom she has a very close relationship, was outside of her mother's house; he lived there as well. She and the cousin walked to the Indiana Avenue house because T.B. wanted to get her phone and wallet. Additionally, she did not want to see her mother or stepfather; her face was red and swollen and she did not want to tell them about the incident. During the walk, which was approximately 20 minutes, T.B. told her cousin that the defendants hit her on her face.

{¶ 21} Upon arriving at the Indiana Avenue house, T.B. also told one of the adults that the defendants hit her in the face. She retrieved her wallet, but still could not find her cell phone. T.B., her cousin, and two females from the house went to the store with T.B. to attempt to purchase a new cell phone. At the store, T.B. realized that her bank card was missing from her wallet. She called her mother to tell her and to ask her to close the account. The group then dropped T.B. off at T.B.'s grandmother's house, and they took her cousin to T.B.'s mother's house. T.B. testified that she did not want to go home because she did not want her mother to see her face.

{¶ 22} At her grandmother's house, T.B. called her father and told him that her cell phone had been stolen, and told him that she was coming to his house, which was in close proximity to the grandmother's house. Upon arriving at her father's

house, T.B. told him and his girlfriend that both her cell phone and bank card had been stolen. Her father asked her if they should call the police and T.B. said yes.

{¶ 23} At about the same time, before the call to the police had been placed, T.B.'s mother and cousin called and the cousin asked T.B. if the defendants had raped her; T.B. responded that they had. It was the first time she had told anyone of the rapes. T.B.'s father then called 911, and told the operator that T.B. had been assaulted and robbed. T.B. told the 911 operator that the theft of her wallet and cell phone happened at Browning's apartment and that she believed C.T. was responsible. At trial, T.B. admitted that C.T. had not been at Browning's apartment at the time in question and that she got that "mixed up." T.B. never told the 911 operator about the rapes; she testified at trial that she did not because her father had already told the operator she was assaulted. Her mother and cousin then came to the father's house, and arrived at about the same time the police did.

{¶ 24} The responding officer testified that T.B. did not tell him anything about being sexually assaulted in a vehicle; relative to the vehicle, T.B. only told the officer that the defendants would not allow her to leave it. T.B. also did not tell the officer about being raped and hit in the living room; she only told him about the sexual assault in the bedroom. The officer testified that he did not observe any injuries to T.B., but T.B. told him that she had been hit so hard in the head that she was having trouble hearing.

{¶ 25} However, T.B.'s mother testified that T.B. appeared to be a "mess." She looked like she "had been through the mill. * * * She was very upset, like, distraught. * * * You could tell that something happened to her."

{¶ 26} After telling the police what had happened to her, T.B. was transported by ambulance to a hospital where she was examined by a sexual assault nurse examiner ("SANE nurse") and a rape kit was administered.

{¶ 27} The SANE nurse testified. Her examination of T.B. started at 10:16 p.m. on April 6, 2017, the date the incident occurred. T.B. told the nurse that she was sexually assaulted by Browning, Bergant, and a third individual whose name she did not know, but whom she knew as Bergant's "brother," i.e., Tenney. T.B. never mentioned that a fourth individual (Metz) was involved.

{¶ 28} She told the nurse that her assailants vaginally assaulted her with their penises and fingers. T.B. told the nurse that the assailants ejaculated on her face, back, and sweatshirt. She had not changed her clothes, showered, brushed her teeth, or been to the bathroom since the assault.

{¶ 29} Specifically, T.B. told the SANE nurse that in the vehicle "Anthony's brother" (i.e., Tenney) was sitting next to her and he "zipped down his pants and pulled [her] head down to his penis and [she] tried to stop him." T.B. did not tell the nurse about the other sexual assault that occurred in the vehicle.

{¶ 30} T.B. further told the nurse that when they arrived at Browning's apartment, the defendants made her get out of the car and then they all went into Browning's apartment. She told the nurse that they pushed her into the bedroom

onto the bed, where Bergant first orally and vaginally raped her. T.B. told the nurse that "Anthony's brother" (i.e., Tenney) and Browning did the same thing to her.

{¶ 31} The SANE nurse testified that T.B. "looked clean" and was "cooperative, [but] tearful at times." The nurse did not observe any injuries on T.B., including on her face or her vagina, but testified that lack of vaginal injury is not uncommon for rape. T.B. told the nurse that she had tenderness and pain on her left shoulder. The medical records from T.B.'s hospital visit that evening indicated that T.B. was "negative" for ear and eye pain.[3]

{¶ 32} The nurse administered a rape kit, which included taking anal, vaginal, oral, and fingernail swabs and smears. Further, samples of dried stains were taken. The SANE nurse also collected T.B.'s pants and sweatshirt; the sweatshirt had ejaculations on the cuff.

{¶ 33} T.B. also consulted with a social worker while at the hospital. The social worker's report did not mention anything about an assault in the vehicle or about four individuals being involved — it only referenced three assailants.

{¶ 34} The technical reviewer from the Cuyahoga County Regional Forensic Science Laboratory who reviewed the analysis of the rape kit and evidence collected at the hospital, as well as buccal swabs that were retrieved from all four defendants, testified.

---

[3]The medical record indicating no eye or ear pain were recorded by someone at the hospital other than the SANE nurse.

**{¶ 35}** The reviewer testified that seminal material was found in the vaginal swabs, anal swabs, and a dried stain taken from T.B.'s cheek. The sperm fraction found in the anal swab was a match to Bergant. There was no statistical match for Tenney, Browning, or Metz from that swab. Further, a dry stain from T.B.'s check matched codefendant Bergant's DNA, but was not a match for the other defendants.

**{¶ 36}** A dry stain taken from T.B.'s lower back contained a mixture of DNA from T.B. and Bergant. None of the other defendants were a match to that stain. As to a dry stain retrieved from T.B.'s hair, there was DNA from T.B., Bergant, and Tenney; there was no statistical match for Browning or Metz.

**{¶ 37}** There was no match for any of the defendants on the fingernail swabs. And in regard to the vaginal swabs, a sperm fraction was found. It was inconclusive as to Bergant, and there was no statistical support for a match in regard to Tenney, Browning, and Metz.

**{¶ 38}** The matter was referred to the sex crimes and child abuse unit of the Cleveland Police Department. The detective assigned to the case testified that he confiscated numerous cell phones when the defendants were arrested in an attempt to find evidence of the taping of the incident as reported by T.B., but did not find the evidence. T.B. had testified that she provided to the detective a list of people whom she believed may have seen the video; the detective testified that was not true — T.B. never provided such a list. The detective further testified that T.B. never told him about the couch incident. The detective admitted that there were "quite a few" inconsistencies in what T.B. told him and what she testified to at trial.

{¶ 39} As previously mentioned, the defense presented two witnesses, the first of which was C.T. (T.B.'s boyfriend at the time of the incident). On the day he testified, there was a warrant out for his arrest. However, about 30 to 60 minutes before C.T. testified, the judge assigned to the arraignment room issued an order withdrawing the warrant and scheduled for C.T. to be arraigned the following day. C.T. testified that he was unaware of that development at the time he came to testify, and came to testify believing that he would be arrested.

{¶ 40} C.T. testified about his relationship with T.B. According to C.T., T.B. "would get real angry when things don't go her way. She'll get real mad and start flipping out. She's more of an angry type of person when it comes to arguing. She's, like, outspoken when it comes to anger."

{¶ 41} C.T. confirmed that the night before the incident he and T.B. got into an argument; she accused him being unfaithful to her, which he denied. According to C.T., he spent the night at the Indiana Avenue house, separate and apart from T.B., and the next morning he got up and told her to leave the house, believing that their relationship was over, but she did not want to leave. C.T. then called Browning to come get him. Browning arrived with the other defendants, and the group, which included the defendants, T.B., and C.T., were outside on the front porch. C.T. denied there being any mention of T.B.'s goddaughter.

{¶ 42} While on the porch, T.B. slapped C.T., and said to C.T. something to the effect of, that if he wanted to cheat on her she was going to have sex with his friends. When asked if he took T.B.'s threat seriously, C.T. responded, "[y]es and

no. Yes, because I knew when she told me she was going to do something, she really meant it." So C.T. testified that when T.B. got in the car with the defendants he believed she was going to have sex with them. C.T. testified that the defendants specifically told T.B. that if she went with them she was going to have to perform oral sex.

{¶ 43} According to C.T., the defendants left with T.B. in the car, but returned approximately ten or 15 minutes later because T.B. was looking for her cell phone. After she could not find it in the house, she returned to the car. C.T. wanted to go with his friends, and leave T.B. at the house, but T.B. was in the car and said she was going with them.

{¶ 44} C.T. testified that in the ten to 15 minutes the group had been gone, he had been on "FaceTime" with Browning. He testified that Browning held his phone so that C.T. could see T.B. in the back seat. At first C.T. testified that T.B. was engaging in "happiness oral sex," later, however, he testified that T.B. was giving Tenney and Metz "hand jobs." C.T. described T.B. as laughing, and her expression was "happy, glad. * * * [L]ike ha, ha, more of a revenge type of thing."

{¶ 45} According to C.T., after the group left the Indiana Avenue house the second time, he told Browning not to bring T.B. back to his house, and Browning did not. However, T.B. eventually returned on foot, this time with her cousin. T.B. was "angry," "furious," and "out of control" because she could not find her phone. Eventually, T.B. and her cousin left the house in a vehicle with some of the other

people from the house. C.T. denied ever taking T.B.'s phone or bank card or facilitating someone into improperly taking her bank card.

{¶ 46} During cross-examination, C.T. testified that he felt T.B.'s conduct was disrespectful toward him because the defendants were like family to him. He did not blame the defendants for having sex with T.B., however. C.T. admitted that he never contacted the police to tell them his version of the events.

{¶ 47} According to C.T., D.W. and A.C. (one of the minors who frequented the Indiana Avenue house and was close friends with Browning) witnessed the FaceTime video call. C.T. also testified that A.C. went with him to Browning's lawyer's office when he told the lawyer about the events.

{¶ 48} The second defense witness was A.C. She did not know Tenney at all, and had just met T.B. days before the incident. A.C. spent the night at the Indiana Avenue house the night before the day of the incident.

{¶ 49} A.C. testified that on the morning of the incident, the group was hanging out on the front porch when T.B. and C.T. got into an argument; T.B. accused C.T. of sleeping with other women. According to A.C., T.B. told C.T. she was going to sleep with his friends. The defendants were not at the house when T.B. made that comment, but they arrived about ten minutes later.

{¶ 50} As the defendants and C.T. started walking toward Browning's vehicle, T.B. started walking with them as well. T.B. told C.T. "no, you're not going with them. I'm going with them." T.B. left with the defendants and C.T. stayed behind. The group was gone for approximately ten minutes before they returned to

the house. T.B. was in a "touchy, playful" mood, while C.T. was "distant." The defendants and T.B. left in Browning's vehicle for a second time. She knew that C.T. and the group FaceTimed but did not see what was occurring — she walked away as the video call was taking place. A.C. testified that C.T. never told her what happened on the FaceTime call.

{¶ 51} A.C. saw T.B. again later that day when T.B. returned to the Indiana Avenue house on foot with her cousin. T.B. came in the house "yelling and screaming about her phone," because she could not find it. Unable to find the phone, T.B. left in a car with someone from the house to go purchase a new phone. According to A.C., T.B. returned to the house again, this time unable to find her bank card, and again "yelling, screaming, and acting crazy" about it.

{¶ 52} A.C. testified that "multiple partner, group sex" was common among her friends and that she believed C.T. engaged in it.

## Assignments of Error

Metz's Assignments of Error

I. The trial court erred in entering a judgment of conviction of rape, which was against the manifest weight of the evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

II. The trial court erred in entering a judgment of conviction of kidnapping, which was against the manifest weight of the evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

III. The trial court erred in failing to merge the offenses of rape and kidnapping.

IV. The trial court erred in imposing a sentence, which was clearly and convincingly unsupported by the record.

Tenney's Assignments of Error

I. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charges, and thereafter entering a judgment of conviction of those offenses as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

II. Appellant's convictions are against the manifest weight of the evidence.

III. The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

Browning's Assignments of Error

I. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

II. The convictions were against the manifest weight of the evidence.

III. Appellant's constitutional rights were violated where defense counsel's conduct was deficient and resulted in prejudice to Appellant.

IV. The trial court erred by denying Appellant's request for a material witness warrant or in the alternative erred by denying Appellant's motion for a brief continuance to compel the presence and testimony of witnesses at trial.

V. The trial court erred by failing to merge all allied offenses of similar import and by imposing separate sentences for allied offenses which violated Appellant's state and federal rights to due process and protections against double jeopardy.

VI. Appellant's thirty one year prison sentence is contrary to law.

Bergant's Assignments of Error

I.  The trial court erred in entering a judgment of conviction of two counts of rape, one count of kidnapping, and one count of assault, which were against the manifest weight of the evidence, in violation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

II.  The state failed to present sufficient evidence of the offenses charged in violation of the Fifth Amendment to the United States Constitution.

III.  The trial court erred by denying Appellant's request for a material witness warrant and for a brief continuance to compel the presence and testimony of witnesses at trial in violation of the Appellant's right to due process and right to a fair trial.

IV.  The trial court erred in failing to merge the offenses of rape and kidnapping.

V. The trial court erred in imposing a sentence which was clearly and convincingly unsupported by the record.

**Law and Analysis**

Sufficiency of the Evidence

**{¶ 53}** Tenney, Browning, and Bergant contend that the trial court erred by denying their Crim.R. 29 motions for judgment of acquittal because the evidence was insufficient to support the convictions.

**{¶ 54}** Pursuant to Crim.R. 29(A), a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  Because a Crim.R. 29 motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence."  *State v.*

*Hernandez*, 10th Dist. Franklin No. 09AP-125, 2009-Ohio-5128, ¶ 6; *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 55} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Sufficiency is a test of adequacy. *Id.* We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 56} The defendants were indicted for rape under R.C. 2907.02, which charged them with engaging in oral sex (Count 1) and vaginal intercourse (Count 2) with T.B. "by purposely compelling her to submit by force or threat of force." They were indicted of kidnapping in Count 3 under R.C. 2905.01(A)(4), which charged that they "did, by force, threat, or deception, purposely remove [T.B.] from the place where she was found or restrain the liberty of her for the purpose of engaging in sexual activity."

{¶ 57} Upon review, the state presented sufficient evidence to sustain both the rape and kidnapping convictions as to the three defendants.

{¶ 58} The defendants' contentions that the evidence was insufficient to support the convictions go to the weight of the evidence, not the sufficiency of the evidence. For example, the defendants contend that the evidence was insufficient because the SANE nurse's notes did not indicate injuries to T.B.'s face and vagina;

or that T.B. went back to the house where C.T. was after the incident, looking for her bank card, which according to the defendants, was an inconsistent action of someone who had just been raped. Their contentions relate to T.B.'s credibility. Credibility is not a consideration for us under a sufficiency-of-the-evidence review, however. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶ 59} In a sufficiency-of-the-evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed; rather the court determines whether, if believed, the evidence supports the conviction. *Id.* at ¶ 79-80; *State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the [fact finder], is enough to support a conviction." *State v. Strong*, 10th Dist. Franklin No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 60} T.B.'s testimony was sufficient to support the convictions. T.B. testified that in the car ride to Browning's apartment, Tenney used his hands to force her head down onto Tenney's lap for her to perform oral sex on him. She specifically testified that the act was completed and that Tenney ejaculated. T.B. further testified that Tenney was the first to sexually assault her at Browning's apartment. She testified that all of the acts were done against her will, and that she repeatedly

requested to be driven home, but her requests were ignored. That testimony was sufficient to support the rape counts.

{¶ 61} T.B. testified that Bergant was the next to assault her at the apartment, vaginally raping her and making her perform oral sex on him. T.B. testified that after Tenney and Bergant sexually assaulted her at the apartment, Browning made them leave the bedroom and forced her to perform oral sex on him and then he vaginally raped her, ejaculating inside of her and into her hair. This evidence was sufficient to support the rape convictions.

{¶ 62} In regard to the kidnapping count, T.B. testified that she got into Browning's vehicle with the intent of annoying C.T.; she had no intention of engaging in any sexual activity with the defendants. She testified that when the vehicle started moving, she asked to be taken home. Browning then told her that she was going to have oral sex with them, and Metz and Tenney thereafter forced her to perform oral sex on them. T.B. further testified that, given what had occurred in the vehicle, once at Browning's apartment, she was afraid to attempt to leave. This evidence was sufficient to support the kidnapping conviction.

{¶ 63} Only Browning was subject to the pandering obscenity count. The charge was based on T.B.'s allegation that he was filming the assaults with his cell phone and that some girls messaged her about seeing the video. Browning was charged under R.C. 2907.32(A)(3), which prohibits the creation, direction, or production of an obscene performance when the offender knows the performance will be publicly presented. R.C. 2907.01(K) defines "performance" as "any motion

picture, preview, trailer, play, show, skit, dance, or other exhibition performed before an audience."

{¶ 64} Browning contends that the evidence was insufficient on this charge because none of the witnesses, including T.B., saw the video, and the investigating detective testified that T.B. never gave him a list of the girls who messaged her about the video, in contradiction to T.B.'s claim. We disagree and find the evidence sufficient to support the charge.

{¶ 65} C.T. (T.B.'s boyfriend) testified that he made a FaceTime call to Browning after the group left the Indiana Avenue house in Bergant's vehicle. According to C.T., Browning held up the phone so that C.T. could see what was happening in the back seat; C.T. testified that he saw "happiness oral sex." C.T. also testified that D.W. (his cousin) saw the FaceTime call. That FaceTime call was evidence of a performance before a live audience.

{¶ 66} Browning and Bergant were the subjects of the misdemeanor assault charges. There was sufficient evidence to support them. Specifically, T.B. testified that as she was putting her pants back on, both Browning and Bergant hit her on the side of her face, so hard that she lost her hearing for a couple of weeks. T.B. testified that one of the punches caused her eye to be swollen. Further, T.B. told the responding officer about being hit. This evidence was sufficient to sustain the misdemeanor assault convictions against Browning and Bergant.

{¶ 67} In light of the above, Tenney and Browning's first assignments of error, and Bergant's second assignment of error, are overruled.

Manifest Weight of the Evidence

**{¶ 68}** All four defendants challenge their convictions on a manifest-weight-of-the-evidence basis.

**{¶ 69}** Unlike sufficiency of the evidence, "a manifest weight challenge questions whether the state met its burden of persuasion." *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 70}** The defendants' contentions under manifest weight of the evidence relate to T.B.'s credibility, and, unlike under the above analysis, are appropriate for our consideration here. Nonetheless, we recognize that in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Thus, in reviewing criminal manifest-weight-of-the-evidence challenges, appellate courts must be

mindful of the presumption in favor of the finder of fact, and defer to the factfinder's resolution of conflicting testimony if the greater amount of credible evidence supports the verdict. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

{¶ 71} It is true that there are certain aspects of T.B.'s testimony that may, at first blush, seem unusual. For example, the defendants cite that after the incident, T.B. wanted to go back to the Indiana Avenue house, instead of her mother's house, as inconsistent with someone who had just been raped. T.B. provided an explanation for that — she did not want her mother to see her and she wanted to retrieve her belongings from the Indiana Avenue house — and the trial court believed her.

{¶ 72} We acknowledge the inconsistencies in T.B.'s testimony and that portions of her account may seem "unusual" as the defendants contend. There is no prescribed manner in which a rape victim reacts to such a crime, however. The trial judge, who also heard the inconsistencies and saw the witnesses first hand, was in the best position to assess their credibility. After reviewing the entire record, we find that this is not an exceptional case in which the trial court clearly lost its way in convicting the defendants; we decline to substitute our judgment for that of the trial court.

{¶ 73} In light of the above, we overrule Metz's first and second assignments of error, Tenney and Browning's second assignment of error, and Bergant's first assignment of error.

Ineffective Assistance of Counsel

{¶ 74} For his third assignment of error, Browning contends that his trial counsel was ineffective because he (1) advised him to waive his right to a jury trial, (2) failed to engage in plea negotiations, and (3) failed to secure witnesses to testify on his behalf.

{¶ 75} The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). To prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was adequate or that counsel's action might be sound trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).

{¶ 76} After the trial court had sentenced defendants Metz and Bergant, Browning's counsel stated that he had committed malpractice by advising Browning to waive his right to a jury. Browning now relies solely on that statement as a ground

for his counsel being ineffective. We are not persuaded. The statement was made only in regard to what counsel anticipated would be coming Browning's way at his sentencing. Counsel's advisement to Browning to waive a jury trial was a tactical decision, not ineffective counsel. *See State v. Sauers*, 11th Dist. Portage No. 92-P-0015, 1992 Ohio App. LEXIS 6250, 9-10 (Dec. 11, 1992).

{¶ 77} We are also not persuaded by Browning's contention that his counsel failed to engage in plea negotiations. When a plea offer by the state is made to a defendant, the law requires that defense counsel communicate the offer to the defendant. *See Missouri v. Frye*, 566 U.S. 134, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012). There is no requirement that the negotiations, if any, be placed on the record. We therefore find that Browning has failed to establish his contention that his counsel failed to engage in plea negotiations.

{¶ 78} Browning further contends that his counsel intended to call D.W. and her aunt to testify on his behalf, but never did. There is no indication of what these witnesses would have testified to, however, and as such, we cannot find that the outcome of the trial would have been different had they testified.

{¶ 79} In light of the above, Browning's third assignment of error is overruled.

Material Witness Warrant

{¶ 80} In Browning's fourth assignment of error, and Bergant's third assignment of error, they contend that the trial court erred by denying their request

for a material witness warrant or, alternatively, for a brief continuance to compel the presence of witnesses.

{¶ 81} The record demonstrates that Bergant never requested a continuance for the purpose of locating and compelling certain witnesses to testify. Browning, through counsel, requested a tentative recess of the trial on March 26, 2018, before the trial began. Prior to opening statements, Browning advised the court that the state was not going to call a couple of witnesses, and Browning wanted to call them. Browning's lawyer explained:

> This is a bench trial, so we're not asking for a continuance. But we're going to do everything that we can in the next several days to locate the witnesses to bring them in on behalf of the defense. I just wanted to give the Court a heads up. And we may need to ask you for a recess for a number days if we're not able to get those witnesses located and get them brought to court.
>
> \* \* \*
>
> I don't want to speak for everyone — but that's something that we thought we should bring to your attention at least. There may be a need at some point mid trial to ask for a recess if we can't get those witnesses in by Wednesday.
>
> But we don't want to ask for a continuance, because candidly, Judge, three of the clients in this case have been in jail for a better part of a year. So we're anxious to begin trial. We just may need to ask for recess at some point.

{¶ 82} The trial court replied: "The court would be more inclined to take your continuance and find your witnesses before you get started because I have no idea how long the recess will go for."

**{¶ 83}** Notably, Browning's counsel was the only lawyer asking for the tentative recess. And Browning's lawyer did not mention requesting a warrant during this discussion. Rather, Browning's lawyer stated: "If we can't find them in a few days, I think, at that point, we would just move forward without." Bergant's lawyer did not participate in this discussion and did not request a continuance, a recess, or a warrant.

**{¶ 84}** The issue of a possible recess was not raised again until several days later, on April 2, 2018, after Browning's lawyer called C.T. and A.C. as witnesses. The court asked if the defense was calling any other witnesses, and Browning's lawyer asked the trial court for more time to obtain personal service of subpoenas for D.W. and her aunt Jody. Browning's lawyer explained: "We attempted to subpoena all of the witnesses who were present at the home and have been unable, unfortunately, to get personal service for either Jody or [D.W.]." Browning's lawyer then asked for a recess to have the two witnesses arrested. Browning's lawyer acknowledged that the court had previously indicated it was not inclined to issue material witness warrants without first obtaining personal service on the witnesses. The trial court then stated: "Well, without personal service, I'm disinclined to issue any material witness subpoenas." Thereafter, Browning's lawyer asked for a continuance of the trial to serve the witnesses, and the trial court denied the request. Bergant's lawyer never requested a continuance, and the defendants rested their cases.

**{¶ 85}** The docket indicates that only Bergant's counsel issued subpoenas to D.W. and two police officers. And there is no evidence that personal service was obtained on any of these witnesses. Thus, although Bergant issued a subpoena to D.W., he never requested a continuance. He, therefore, failed to preserve the issue for appeal. A party must raise an issue in the trial court in order to preserve the issue on appeal. *Niskanen v. Giant Eagle, Inc.,* 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 34.

**{¶ 86}** Even if the issue had been preserved for appeal, we cannot say the trial court erred in denying Browning's request for a continuance. We review a trial court's judgment denying a motion for continuance for an abuse of discretion. *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus. "An abuse of discretion occurs when a trial court's decision is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 87}** Bergant cites *State v. Hollins*, 8th Dist. Cuyahoga No. 103864, 2016-Ohio-5521, for the proposition that the trial court abused its discretion by denying the requested continuance to issue a material witness warrant. In *Hollins*, this court found the trial court abused its discretion by refusing to grant the state's motion for a material witness warrant and then dismissing the indictment when the witness failed to appear. However, the state had obtained personal service on the witness and asked for the material witness warrant prior to trial. *Id.* at ¶ 6. And the state submitted an affidavit in support of its motion averring that the witness was material

because she was the alleged victim and eyewitness of the defendant's conduct. *Id.* at ¶ 7. The court did not rule on the motion until the case was called for trial and the material witness failed to appear. The state again asked the court to grant the material witness warrant, but the court denied the motion and dismissed the indictment. *Id.* at ¶ 11.

**{¶ 88}** In contrast to the facts of *Hollins*, the trial court in this case offered to grant the defendants a continuance in order to locate and subpoena witnesses before the trial started. Browning's lawyer indicated that Browning did not want a continuance. Bergant's lawyer remained silent and, therefore, indicated that he was not interested in continuing the trial either. Moreover, the trial court indicated that it was not inclined to grant a "several day recess" in the middle of trial when the defendants could have obtained a continuance to secure the witnesses before trial. Thus, the defendants knew before trial that they could have more time to personally serve subpoenas on witnesses before trial, or they could proceed with the trial knowing that the court would probably not grant a continuance at a later date. They chose the latter option.

**{¶ 89}** On this record, we cannot say the trial court abused its discretion in denying the mid-trial request for a continuance and for a material witness warrant when the defendants had not yet obtained personal service on the witnesses and the court gave the defendants an opportunity to secure the witnesses before trial.

**{¶ 90}** Therefore, Browning's fourth assignment of error and Bergant's third assignment of error are overruled.

Sentencing

{¶ 91}  As mentioned, the trial court sentenced Metz to a 15-year prison term, Tenney and Browning to 30-year-prison terms, and Bergant was sentenced to a 31-year-prison term.  The sentences consisted of consecutive terms. In their final assignments of error, the defendants contend that the trial court improperly sentenced them to consecutive terms.  We agree and find that the consecutive sentences are not supported by the record.

{¶ 92}  Our review of felony sentencing must be "meaningful."  *See State v. Bratton*, 6th Dist. Lucas Nos. L-12-1219 and L-12-1220, 2013-Ohio-3293, ¶ 8, citing *State v. Carter*, 11th Dist. Portage No. 2003-P-0007, 2004-Ohio-1181.  In order to conduct a "meaningful review," we are required to review the entire record, including any reports that were submitted to the court (i.e., a presentence, psychiatric, or other investigative report), the trial record, and any statements made to or by the court at sentencing.  *See* R.C. 2953.08(F)(1)-(3).

{¶ 93}  After reviewing the entire record, if we clearly and convincingly determine that the "record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law," then we have the authority to "increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing."  R.C. 2953.08(G)(2); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

In the final analysis, we hold that R.C. 2953.08(G)(2)(a) compels appellate courts to modify or vacate sentences if they find by clear and convincing evidence that the record does not support any relevant findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code.

*Marcum* at ¶ 22.

Under R.C. 2953.08, appellate courts may not modify or reverse a sentence at their whim or fancy. And there is no question that trial courts have wide discretion to fashion a sentence within the statutory framework. That does not mean, however, that appellate courts should not fulfill their duty to actively review a record to determine if it supports the trial court's sentence — to provide meaningful appellate review of a felony sentence.

*State v. Roberts*, 2017-Ohio-9014, 101 N.E.3d 1067 (8th Dist.), ¶ 41 (Boyle, J., dissenting).

{¶ 94} With the above in mind, we now consider the defendants' sentences. We initially note that under R.C. 2929.41(A) there is a presumption that prison sentences for multiple offenses be served concurrently. However, R.C. 2929.14(C)(4) authorizes the trial court to order consecutive sentences if it makes at least three distinct findings: "(1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the subsections (a), (b) or (c) applies." *State v. Price*, 10th Dist. Franklin No. 13AP-1088, 2014-Ohio-4696, ¶ 31, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659.

**{¶ 95}** Subsections (a), (b), and (c) of R.C. 2929.14(C)(4) provide as follows:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 96}** In regard to subsections (a), (b), and (c), the trial court found that (b) applied, stating,

Furthermore, the sentence is necessary because the defendant committed the offenses resulting in the aiding of the kidnapping of the victim, raping her in the car while she was being kidnapped, while the act was being filmed by codefendant Jaustin Browning and accompanied the three other defendants to Browning's apartment where he again raped her and she was repeatedly raped by his codefendants, activity which is so severe that a single prison sentence for the offenses would not adequately reflect the seriousness of the crime.

**{¶ 97}** The trial court also made the required findings under R.C. 2929.14(C)(4) that consecutive terms are necessary to protect the public from future crime by the defendants and that they are not disproportionate to the seriousness of the defendants' conduct and the danger they pose to the public. The trial court also incorporated its findings into the sentencing entry, as required under *Bonnell. Id.* at ¶ 29. But in accord with the discussion above, our inquiry does not end there. We

must also determine whether we clearly and convincingly find that the record supports the consecutive sentences. We find it does not.

{¶ 98} One of the troubles that we have with the sentences is in regard to the trial court's finding that a single prison sentence would not adequately reflect the seriousness of the crime. Rape and kidnapping, without debate, are serious crimes. In its findings, the trial court focused on the fact that T.B. was "repeatedly raped by the defendants." And each defendant was convicted and sentenced, too; we find imputing each defendant's conduct to the other defendants as a ground to impose consecutive sentences unfair — the defendants were not charged and tried as a coconspirators; they were codefendants. In fact, at Browning's sentencing, the assistant prosecuting attorney, in opposition to defense counsel's request for the trial judge to recuse himself given the sentences he had already handed down on Metz (15 years) and Bergant (30 years), stated that the court "can judge each defendant individually with regard to what was proven that each did and objectively, as the court has." This record does not reflect that the court judged each defendant individually, however.

{¶ 99} We especially find Metz's sentence disproportionate to the seriousness of his conduct. Even by the state's concession, Metz was "apprehensive to participate in the gang rape." As mentioned, his penis was flaccid when he forced T.B. to put it in her mouth, which T.B. testified she did for "about a minute." Metz did not ejaculate and, moreover, he did not go into the bedroom at the apartment where the other assaults occurred.

**{¶ 100}** We further find troubling the trial court's reasoning that consecutive sentences were necessary because the crime was filmed, because no video was ever recovered and the witnesses all testified that they had never seen one. Further, there was inconsistency in the testimony about whether anyone had seen the video: T.B. testified that she provided the investigating detective with a list of people she believed may have seen it, but the detective testified that was not true.

**{¶ 101}** Another trouble we have is with the trial court's findings that consecutive sentences were necessary to protect the public from future crime by the defendants, and that consecutive sentences were not disproportionate to the danger they pose to the public. Implicit in those findings is a finding that, based on the defendants' prior criminal history, they are likely, if not incarcerated to consecutive terms, to offend again. Metz and Tenney do not have lengthy criminal histories, however. Metz has a limited juvenile record. Tenney has two misdemeanor juvenile offenses, and two adult felony drug possession convictions. On this record, we cannot agree that there exists a need to impose consecutive sentences to protect the public from future crime by Metz or Tenney, or that they are not disproportionate to the danger he poses to the public.

**{¶ 102}** We recognize that Bergant has some prior juvenile adjudications and Browning has a lengthy juvenile record. But they were juvenile adjudications which, under Ohio law, are treated differently from adult convictions. *See generally State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E. 3d 448.

**{¶ 103}** We further consider that "lengthy prison sentences do not make the public safer, in part, because 'long-term sentences produce diminishing returns for public safety as individuals "age out" of the high-crime years.'" Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87:1 UMKC.L.Rev. 121 (2018).

> In other words, the risk an individual may pose to public safety declines with age and each successive year of incarceration is likely to produce diminishing returns for public safety. Id. at 22; *see also* Nazgol Ghandnoosh, The Next Step: Ending Excessive Punishment for Violent Crimes, https://www.sentencingproject.org/publications/the-next-step-ending-excessive-punishment-for-violent-crimes (accessed Aug. 14, 2019) ("Although the violent crime rate has plummeted to half of its early-1990s level, the number of people imprisoned for a violent offense grew until 2009, and has since declined by just 3%. This trend stems from increased prison admissions and sentence lengths, despite evidence that excessive penalties are counterproductive.").

**{¶ 104}** There is also the consideration of the defendants' ages — at the time of sentencing they were in their early 20s. They were not juveniles, but nonetheless they were "young offenders." "[I]ncarceration is particularly ineffective at reducing certain kinds of crimes: in particular, youth crimes, many of which are committed in groups * * *." *Criminal Justice Facts, Our criminal justice system today is like a bicycle stuck in one gear: the prison gear*, https://www.sentencingproject.org/criminal-justice-facts, copyright 2019 (accessed Aug. 14, 2019).

**{¶ 105}** In regard to "aging out of crime," "[r]esearch shows that crimes starts to peak in the mid- to late- teenage years and begins to decline when individuals are in their mid-20's. After that, crime drops sharply as adults reach

their 30s and 40s." *Id.* Thus, "'[b]ecause recidivism rates decline markedly with age, lengthy prison sentences, unless they specifically target very high-rate or extremely dangerous offenders, are an inefficient approach to preventing crime by incapacitation.'" *Id.*, quoting the National Research Council.

**{¶ 106}** In addition to the concerns about what impact lengthy prison terms have on recidivism, there is also the concern about the cost to the public for such sentences. Indeed, the Ohio legislature has considered the tremendous cost of incarceration:

> A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender *using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources.* To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(Emphasis added.) R.C. 2929.11(A).[4]

**{¶ 107}** There are also other collateral consequences of mass incarceration that we should be concerned with, namely the reentry of offenders into

---

[4]There are now three overriding purposes set forth in R.C. 2929.11(A). *See* S.B. 66, Section 1, effective October 29, 2018. The third overriding principle is "to promote the effective rehabilitation of the offender." The defendants were sentenced prior to the amendment's effective date. Moving forward the trial court will be required to carefully consider and give equal weight to the new sentencing purpose of promoting "effective rehabilitation." It is evident that S.B. 66 was formulated in an effort to reduce mass incarceration by rehabilitating individuals, expanding prison alternative programs, and reducing aggregate prison terms. The amendment to R.C. 2929.11 is not inconsequential and sentences should start reflecting the legislature's comprehensive goals.

society once their prison terms are completed. Under the sentences imposed here, the defendants will be in their early 50s when they are released — that certainly raises questions about what their lives will be like at the time, especially in terms of finding employment and housing.

{¶ 108} Having addressed the issue of protecting the public from future crime by the defendants, there remains the other sentencing purpose of punishment. And as we have said, rape and kidnapping are serious and violent crimes. This case, in our opinion, was not a "slam dunk" for the state, however. There were credibility issues with T.B., the victim, as well as with C.T. and A.C., the defense witnesses. However, as previously discussed, we defer to the trial court's, as the trier of fact, resolution of those credibility issues. But to impose such a severe punishment on a case such as this is troubling.

{¶ 109} We do not take our position on the consecutive sentences in this case lightly. But for too long appellate courts, including this one, have been too much of a "rubber stamp" when it comes to sentencing, especially in instances of excessive consecutive sentences. And we certainly are aware that there are instances when severe, lengthy sentences are appropriate either to protect the public, punish the offender, or both. We just do not find that to be the case here.

{¶ 110} In conclusion, we find the defendants' assignments of error on their consecutive sentences is well taken. We clearly and convincingly find that the record does not support the trial court's findings for the imposition of consecutive sentences under R.C. 2929.14(C)(4). Thus, on the authority contained in Section

3(B)(2), Article IV of the Ohio Constitution and R.C. 2953.08(G)(2)(b), we remand for resentencing.

{¶ 111} Metz's fourth assignment of error, Tenney's third assignment of error, Browning's sixth assignment of error, and Bergant's fifth assignment of error are well taken; our disposition on these assignments of error render Metz's third assignment of error, and Browning's fifth and Bergant's fourth assignments of error moot.

{¶ 112} Judgments affirmed in part; judgments reversed in part. Case remanded for resentencing.

It is ordered that appellants and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

EILEEN T. GALLAGHER, P.J., CONCURS
AND DISSENTS WITH SEPARATE OPINION;
SEAN C. GALLAGHER, J., CONCURS AND
DISSENTS WITH SEPARATE OPINION


EILEEN T. GALLAGHER, P.J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 113} I concur with the majority's conclusion that the defendants' convictions are supported by the manifest weight of the evidence. All the defendants attacked the victim's credibility, arguing that her behavior after the incident in Browning's car and apartment was not consistent with that of a rape victim. They also asserted that her trial testimony was not consistent with statements she made to police and to the SANE nurse in the first few hours after the rapes. However, after reviewing the record, I do not think this is a rare case in which the evidence weighs heavily against conviction.

{¶ 114} As an appellate court, we are unable to view the witnesses' demeanor, gestures, facial expressions, and voice inflections that are plainly apparent to the trier of fact. These outward behaviors are not evident in a written transcript. Demeanor is not what the witness says, but the manner in which he or she says it. Demeanor evidence is invaluable in assessing a witness's credibility, yet it is totally lost in transmission to the court of appeals. It is for this reason that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 115} "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288,

1997 Ohio App. LEXIS 3709, 4 (Aug. 22, 1997). Although we have the discretionary power of a "thirteenth juror" to grant a new trial, that power "'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d 380, 387 678 N.E.2d 541 (1997), quoting *Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶ 116} Despite a few exceptions, the victim's testimony was consistent. And although there were a few discrepancies between the victim's testimony and investigators' accounts of her statements to them, I do not think these minor differences weighed so heavily against conviction that a new trial should be ordered. After weighing all of the evidence, including the testimony of defense witnesses that corroborated some of the victim's testimony, I find that the manifest weight of the evidence supports the defendants' convictions.

{¶ 117} I disagree, however, from the majority's conclusion that the defendants' sentences are not supported by the record. The majority finds fault with the trial court's consideration of each defendant's conduct in relation to the others. They assert that because the defendants were not charged and tried as co-conspirators, their actions should be viewed separately. But this was a gang rape. The harm caused by each rape was compounded by the others. I believe the trial court was correct when it found that consecutive sentences were

> necessary because the defendant committed the offenses resulting in the aiding of the kidnapping of the victim, filming her being raped while being kidnapped and at his apartment and accompanied the three other defendants to Browning[']s apartment where he raped her twice while she was repeatedly raped by his co[-]defendants, activity

which is so severe that a single prison sentence for the offenses would not adequately reflect the seriousness of the crime.

(Tr. 754-756.)

{¶ 118}     Therefore, I respectfully dissent.


SEAN C. GALLAGHER, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 119}     Upon reviewing the entire record, I believe the defendants' convictions should be reversed as being against the weight of the evidence, but I concur with the decision to reverse the imposition of consecutive sentences for the reasons in this opinion.

{¶ 120}     The account of events related by the victim at trial was at times different from (1) the account she provided immediately after the incident, and (2) the accounts she provided throughout the subsequent investigation.  But make no mistake, the problem with these cases does not entirely lie with inconsistencies in the victim's version of events.  The trier of fact may consider all evidence, including any inconsistencies within that evidence, and still reach a conclusion that an offender is guilty of the charged crime.  The inconsistencies weigh on this process, but are not dispositive in and of themselves.  The primary problem in this case is that the state failed to offer an explanation harmonizing the victim's divergent story lines for the purpose of demonstrating that the greater weight of credible evidence proved the defendants' guilt beyond a reasonable doubt.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.  In these cases, the trier of fact was

not offered any explanation upon which an overall credibility determination could have been made in the state's favor. The state had every opportunity to address the inconsistencies, but instead the state largely ignored the inconsistent versions of events and the late disclosures that occurred for the first time at trial.

<u>Standard of Review: Manifest Weight of the Evidence</u>

**{¶ 121}** When reviewing the weight of the evidence, unlike sufficiency review that tests the adequacy of the evidence in a light most favorable to the state, appellate courts address the "evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. In undergoing this review, appellate courts must "ask whose evidence is more persuasive — the state's or the defendant's?" *Id.* This means that

> 'The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001) (ellipsis and alterations sic). Appellate courts do not defer to the trier of fact when reviewing the weight of the evidence. We sit as the thirteenth juror with the ability to disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶ 122}     The majority defers to the trial court's ability to observe the witnesses' testimony firsthand, concluding that the trial judge was in the best position to assess credibility and weigh the evidence based on the witnesses' demeanor, gestures, facial expressions, and so forth.  That deference to the trier of fact's ability to observe the demeanor, gestures, and voice inflection, stems from the now-defunct civil manifest-weight-of-the-evidence standard and has no place in criminal cases, much less within the standard of reviewing the weight of the evidence.  *Wilson* at ¶ 24.  Regardless, the Ohio Supreme Court has eliminated the civil standard in favor of the criminal standard as announced in *Thompkins*. *Volkman* at ¶ 20.

{¶ 123}     This step alone, however, was not sufficient to stem the tide of cases that claim the weight of the evidence includes a deferential standard that permits appellate courts to defer to the trier of fact's weighing of the evidence and credibility determinations.  In all such instances, there is a claim, or a derivation of a similar theme, that the weight of the evidence and credibility of the witnesses is primarily for the trier of fact.  *See, e.g., State v. Heard*, 8th Dist. Cuyahoga No. 107777, 2019-Ohio-2920, ¶ 25, citing *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, and *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967); *State v. Becker*, 8th Dist. Cuyahoga No. 100524, 2014-Ohio-4565, ¶ 37; *State v. Rexrode*, 10th Dist. Franklin No. 17AP-873, 2018-Ohio-3634, ¶ 11; *In re N.Z.*, 11th Dist. Lake Nos. 2010-L-023, 2010-L-035, and 2010-L-041, 2011-Ohio-

6845, ¶ 35, citing *DeHass*. The majority, in both the majority and the concurring opinions, cites this proposition as well.

{¶ 124}    In one form or another, this language — that credibility determinations are primarily for the trier of fact — comes from the sufficiency-of-the-evidence review. *DeHass*; *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). It is unclear why appellate courts have inserted this approach into weight-of-the-evidence review. In *DeHass*, for example, the Ohio Supreme Court held that in civil and criminal cases, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact and a reviewing court may not reverse a judgment where the record demonstrates that the verdict is based on sufficient evidence. *Id.* at syllabus. Despite the unambiguous implications that *DeHass* is specifically referencing sufficiency analysis, courts cite *DeHass* in support of the standard of review with respect to the manifest weight of the evidence. *See, e.g.*, *State v. Hale*, 8th Dist. Cuyahoga No. 107646, 2019-Ohio-3276, ¶ 82; *State v. Riggins*, 1st Dist. Hamilton No. C-180069, 2019-Ohio-3254, ¶ 42; *State v. Loomis*, 10th Dist. Franklin No. 17AP-843, 2019-Ohio-2576, ¶ 47. By deferring to the trier of fact's credibility determinations when reviewing the weight of the evidence, the appellate courts accept the evidence in favor of the verdict while discounting the evidence favorable to the defendant. In essence, this is sufficiency review masquerading as weight-of-the-evidence review.

{¶ 125}    The Ohio Supreme Court does not follow this approach. In direct review of capital cases, the Ohio Supreme Court cites *DeHass*, or another case with

a similar conclusion, in addressing the sufficiency of the evidence, but when addressing the standard underlying the weight of the evidence, the court shifts to *Thompkins* and the thirteenth-juror concept. For example in *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 2, the Ohio Supreme Court affirmed a capital conviction in which both sufficiency and the weight of the evidence were at issue. In relating the sufficiency standard of review, the court noted that the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *Id.* at ¶ 118, citing *DeHass*; *see also State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12 (weight and credibility of witnesses are matters primarily for the trier of fact in determining whether the evidence is sufficient to support the verdict); *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 180 (same as *Walker*). In other words, the sufficiency review is born from the deference given to the trier of fact's ability to observe the witnesses at trial and weigh the conflicting evidence.

{¶ 126} However, in addressing the weight-of-the-evidence argument, the Ohio Supreme Court shifts its analysis. "A claim that a verdict is against the manifest weight of the evidence involves a different test." *Hunter* at ¶ 119. The court then cites the *Thompkins* thirteenth-juror analysis in which the appellate court must resolve the conflicting evidence and consider the credibility of the witnesses from its review of the record. *Id.* Under the weight-of-the-evidence review, the court in *Hunter* concluded that despite the discrepancies in the record, and after reviewing the entire record, the court was unable to conclude that the testimony was not

inherently unreliable or unbelievable. *Id.* at ¶ 128. Thus, the Ohio Supreme Court does not defer to the trier of fact's ability to observe the witness's demeanor when reviewing the weight of the evidence.

{¶ 127} The majority and the separate concurring opinions, cite *DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212, in overruling the defendants' manifest-weight-of-the-evidence review, claiming that the weight of the evidence and the credibility of the witnesses is primarily for the trier of fact. Disregarding the inherent contradiction in that citation, for how can one simultaneously review the weight of the evidence while deferring to the trier of fact's determination as to the weight of the evidence, *DeHass* specifically applies to the sufficiency-of-the-evidence analysis. *Id.* at 234 (after setting forth the deferential standard, the court expressly stated that "In conclusion, * * * there was evidence sufficient to support the verdict * * *). The citation to *Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548, falls prey to the same analysis. In *Antill*, the Ohio Supreme Court deferred to the trier of fact specifically under the sufficiency-of-the-evidence analysis. *Id.* (after citing the deferential standard the court stated that "[w]e, therefore, find that there was *sufficient* evidence in this cause * * *."). (Emphasis added.)

{¶ 128} It is for this same reason that the separate concurring opinion's reliance on *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 4, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997), is misplaced. In *Jenney*, the Ohio Supreme Court was expressly deciding whether there was sufficient evidence in support of the

conviction.  *Id.* at ¶ 14, 22.  That case does not involve a weight-of-the-evidence review, and quite simply we cannot inject sufficiency law into the weight-of-the-evidence standard.

{¶ 129}     It is for this reason that the majority and concurring decisions to overrule the defendants' weight-of-the-evidence argument, based on the claim that the finder of fact "was in the best position to assess [the witnesses'] credibility," is misplaced — the incorrect standard is being used.  By deferring to the trier of fact's credibility determinations, which weighed in the state's favor in light of the verdict, the majority is essentially performing a sufficiency-of-the-evidence review in which all credibility determinations are found in favor of the state.  It may well be time that the Ohio Supreme Court review the continued use of *DeHass*, or a similar sufficiency case, within the weight-of-the-evidence standard of review.  Regardless, the majority and concurring decisions ignore the *Thompkins* standard and simply defer to the trial court's weighing of the evidence and credibility determinations.

Weight of the Evidence: the Conflicting Testimony

{¶ 130}     It is on this last point that my opinion diverges from my colleagues.  I believe the convictions are against the weight of the evidence and these cases should be remanded for a new trial.  Under *Thompkins,* 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, we must weigh the conflicting evidence and all reasonable inferences, independently consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment

must be reversed and a new trial ordered. *Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. Under this standard, I cannot conclude that the state met its burden to prove the defendants' guilt beyond a reasonable doubt.

{¶ 131} The victim's story was inconsistent, even throughout the trial. On this point, the lead detective's trial statement that the victim inconsistently described "the suspects, who they are, what they did, where this occurred, in the home, in the bedroom" haunts this case. But, as mentioned before, it is not the inconsistencies in and of themselves that are dispositive; it is the state's inability to offer a reason upon which it could be determined that the state's case is based on the greater weight of credible evidence despite the inconsistences.

{¶ 132} The victim's initial reporting of the crime differed remarkably with the crimes actually charged. This is not simply a minor discrepancy that can be disregarded. When the victim spoke with the emergency dispatcher, she claimed that Browning, Bergant, and the victim's boyfriend C.T. physically assaulted and robbed her at an apartment on West Boulevard (Browning's apartment). This statement was inconsistent with the victim's trial testimony in which she claimed her phone and bank card were stolen at the east side home of the victim's friend. The victim stated that her boyfriend put her in a chokehold and then the trio stole her cell phone and credit card before driving her back to her mother's house. The dispatcher then asked if the victim had been kidnapped, which elicited an affirmative response. The victim's statements to the emergency dispatcher do not

appear to be the basis of any indictment, and further, neither the state nor the police interviewed the victim's boyfriend — the alleged perpetrator of the crime.

{¶ 133} None of those claims were investigated, much less led to any indictments. Importantly, the victim, at trial, claimed that she reported a sexual assault to the emergency dispatcher because her father mentioned the "assault" to the dispatcher. The problem with that statement is that C.T. did not participate, was not alleged to have participated, and did not become the subject of the sexual assault allegations. The victim's attempt to claim she reported the assault, to mean the sexual assault, introduced more inconsistencies into the trial than it resolved.

{¶ 134} According to the responding police officer's report and testimony, the victim changed the narrative from what was initially reported. The state claims that the victim was hesitant to disclose the sexual assaults in front of her parents, although in contrast she testified that she told them of the rapes before calling the emergency dispatcher. The victim told the responding officer that Browning and Bergant picked her up from the east side location. According to the responding officer, the victim claimed that Browning and Bergant then drove to pick up Bergant's brother Tenney, whom the victim only knew as "Bergant's brother," and an unknown fourth person (this person was never identified in the record). It was then that the group proceeded to Browning's West Boulevard apartment, where the three men (Browning, Bergant, and Tenney) forced the victim into the bedroom to facilitate the rapes. The responding officer was not told about Metz's involvement or about any sexual activity occurring in the car. In addition, this was the last time

that the victim mentioned that only two persons were initially in the car and the other two persons were picked up along the way.

{¶ 135} According to the medical records, the victim told the examining nurses that she was vaginally and orally raped by three men, Browning, Bergant, and Tenney, although Tenney was again identified as Bergant's brother. It was noted that the victim did not contaminate or wash away the physical evidence between the alleged assaults and her arrival at the hospital. The examining nurses were not told about a fourth person's involvement. The victim told the examining nurse that during the car ride, Tenney unzipped his pants and pulled the victim's head down, forcing her to perform fellatio. The victim did not mention Metz's involvement to the nurse, who testified to writing "down verbatim what [the victim] tells me." The victim claimed at trial that she told the nurses about Metz's involvement and the nurses must be mistaken.

{¶ 136} According to what the victim told the healthcare professionals, when the defendants and the victim arrived at Browning's apartment, the three defendants pushed her into the bedroom and Bergant was the first to vaginally rape the victim after forcing her to perform fellatio on him. When Bergant left the room, Tenney and Browning both vaginally raped the victim for about an hour. According to the victim's statement to the nurses, none of the defendants used condoms. The victim told the nurse that the defendants orally and vaginally raped her and ejaculated on her face, back, and sweatshirt (the sweatshirt was preserved, but there was no discussion of any forensic testing on the sweatshirt at trial). After the

assaults, according to the victim's trial testimony, Browning allegedly punched the victim in the face with enough force to cause her eye to swell shut. The examining nurse did not record or otherwise observe any signs of trauma to the victim's face, but she noted that the victim complained of shoulder pain, latent pain around the orbital bone of her eye, and ringing in her ear.

{¶ 137} It is not clear from the record, but it appears the victim disclosed to the investigating detective that Metz was a fourth person involved in another sexual assault that occurred during the car ride. This differed from her initial statement to the responding officer that only Bergant and Browning were in the car initially and that Tenney and an unknown individual were picked up along the way. It also differed from her statement to the nurses in which Tenney was the only person to assault her during the car ride. According to the prosecutor's opening statement at trial, the anticipated evidence would demonstrate that Metz's involvement was limited to attempting to pull the victim's pants off while the victim was orally raped by Tenney in the initial car ride. The prosecutor did not indicate an attempt to prove that Metz actually committed rape. When confronted at trial with the conflicting statements given to investigators and healthcare personnel about Metz's involvement, the victim doubled-down on her view that law enforcement and the healthcare professionals were mistaken, necessarily pitting her credibility against theirs.

{¶ 138} At trial, the victim claimed that she was forced to perform fellatio on Metz first, but he remained flaccid during the encounter; but the testimony

establishing penetration having occurred was not straightforward. During her direct examination, the victim testified that she was able to stop Metz from pulling her head down so that no penetration had occurred. During cross-examination by Browning's counsel, however, the victim claimed that penetration did occur. Regardless, the state offers no explanation for its limiting Metz's involvement to attempting to pull the victim's pants off when relating the anticipated facts in the opening statement as compared to the victim's trial testimony.[5]

{¶ 139}     After arriving at the West Boulevard apartment, according to the victim, Bergant parked the car in the attached parking lot. The defendants walked toward the apartment, and the victim voluntarily followed. Once inside the apartment, the victim testified that Browning, Bergant, and Tenney entered the bedroom first and she followed — a detail contradicting her earlier statements to the nurses and the responding officer in which she claimed that the defendants forced

---

[5]In the opening statement, the state claimed: "And during this ride, Richard Tenney forces [the victim] to give him oral sex. And during this drive, it's Anthony Metz who is trying to pull down [her] pants from the other side." Tr. 20:13-17. That is in stark contrast to the state's closing argument:

> And here we heard testimony from [the victim] that in the car it was Anthony Metz sitting on her right, Tenney sitting on her left. She said as soon as she got in the car, Metz started pulling down his pants and he started unzipping his pants and then he grabbed [the victim] by her head. [Metz] was sitting on the right of her, and she was in the center. He grabbed her head with both of his hands and he pushed her down on his penis with her mouth. She said that he was not successful at first, and then eventually she was able to push her head up. She said that he was pushing her down, but she was able to get up.

Tr. 652:7-21.

or pushed her into the bedroom. According to her trial testimony, Tenney was the first to vaginally rape her, immediately followed by Bergant — which contradicted the victim's narrative to the nurses in which Bergant was first. Browning sat on a dresser in the bedroom and held his phone in such a manner as it suggested that he was recording the events. After Tenney and Bergant finished, with Bergant ejaculating during the vaginal penetration, the victim walked into the living room where Metz had remained, and an unknown defendant pushed her on the couch and vaginally raped her from behind. The couch incident was never reported to the responding officer, the detective, or the healthcare professionals. When confronted with that fact at trial, the victim claimed she told "everyone" about the incident on the couch, and she could not explain why no one recorded that fact in their notes. The state offered no further explanation on this point.

**{¶ 140}** After the incident on the couch, the victim testified that she again followed the defendants back into the bedroom when Bergant raped her. After Bergant finished, Browning forced the others to leave and then he vaginally raped the victim. The victim testified that Browning ejaculated during the vaginal penetration and then into her hair — a statement that was not demonstrated by the forensic evidence, which excluded Browning as a contributor to the material collected from the hair (in actuality no seminal fluid was recovered from the victim's hair) and excluded Browning as a contributor to any of the DNA samples preserved in the vaginal swabs. The state did not offer any explanation for the differences between the testimony and the physical evidence.

{¶ 141}     The defendants took the victim back to her mother's house.  The victim, according to her testimony, refused to get out of the car.  She insisted on being returned to the east side location from which the series of events began.  After walking back to the east side location, the victim claims to have told one of her friends of the rape before reporting it to her parents and the police.  The state originally subpoenaed that friend to testify but inexplicably withdrew the subpoena on the day of trial.  The defendants were not able to perfect service of their own subpoena before trial.  The trial court refused to issue a bench warrant or to delay the bench trial, once it commenced, in order for the defense to ensure her appearance.  In addition, the trial court refused to permit the detective to discuss the course of his investigation with respect to the victim's friend, sustaining almost every objection to the cross-examination on that point for an unexplained reason.

{¶ 142}     During her direct examination, the victim testified that she had no knowledge of what happened to the video she claims Browning took — when asked during her direct examination if she knew what happened to the video, the victim unambiguously responded, "I have no clue."

{¶ 143}     During her cross-examination, however, the victim changed the narrative and claimed that undisclosed females "messaged" her on Facebook referencing the video.  She was unsure how many of the girls contacted her, claiming a handful or six had seen the video.  The victim claimed she told the investigating detective of the encounter and provided a list of names, but the detective testified to the contrary.  Likewise, the state's opening statement was limited to the fact that the

investigating detective was unable to find evidence of the video — the prosecutor did not mention the "messaging" incident in the opening statement although the victim's "messaging" testimony was relied on during the closing argument. The state never explained why it left the messaging incident out of its opening narrative meant to foreshadow the state's anticipated trial evidence.

{¶ 144} The state presented forensic evidence implicating Bergant to have engaged in sexual conduct with the victim through the testing of seminal material; the DNA evidence with respect to the other defendants was innocuous at best. Bergant was identified through the seminal material from the samples preserved in the anal swab and the swab of the dried stain on the victim's cheek. The sperm inclusion from the vaginal swab was inconclusive as to Bergant, and excluded the other defendants as contributors. Browning was identified through an inconclusive epithelial fraction from a sample collected from under the victim's fingernail. Tenney was identified through an epithelial fraction from the hair swab, also from material not identified as seminal material (the hair swab was preserved based on the victim's claim that Browning ejaculated in her hair). The victim, however, was undisputedly in Browning's apartment and bedroom and sat next to Tenney during the car ride. Identifying Browning and Tenney through that material, which was not identified as seminal fluid, does not give rise to any inference of wrongdoing — at best, it is only probative of proximity, which is undisputed in this case. *State v. McNew*, 2d Dist. Montgomery No. 22902, 2009-Ohio-5531, ¶ 45 (state failed to prove digital penetration because the victim's DNA

found on the defendant's hand could not be identified as vaginal fluid and the victim and defendant resided together, explaining the presence of the victim's DNA).

{¶ 145}     There is no dispute that the testimony of the victim is the sole evidence upon which Metz's, Tenney's and Browning's convictions rest. Although the state presented forensic evidence implicating Bergant in having sexual contact with the victim, in light of my conclusion that other defendants require a new trial, so, too, must Bergant. In this joint trial, the problems with the verdict with respect to three of the four offenders, at the least, cast doubt on Bergant's conviction.

{¶ 146}     In order to find the defendants guilty of rape and kidnapping beyond a reasonable doubt, the victim would have to be given the benefit of every doubt in light of (1) the inconsistent narrative; (2) her trial testimony that conflicted with itself, the reporting to the nurses, the responding officer, and the detective; and (3) her testimony that conflicted with the physical evidence the state presented. In order to affirm, we would have to disregard the clear inconsistencies while accepting the evidence favorable to the state.

{¶ 147}     If her trial testimony was inconsistent with the narrative related to the nurses and investigators but the forensic evidence supported her testimony, or vice versa, that would be a different case. *See, e.g., State v. Henderson*, 10th Dist. Franklin No. 10AP-1029, 2011-Ohio-4761, ¶ 26 (the lack of any forensic evidence is not dispositive when the victim's testimony is corroborated by the consistent statements the victim made to treating nurses performing the rape examination); *People v. Kotko*, Cal.App. No. C079944, 2019 Cal. App. Unpub. LEXIS 831, 54

(Feb. 1, 2019) (conflicting forensic evidence is not dispositive in light of the "remarkably coherent" and consistent testimony of the victim). If that were the case, there would be an explanation harmonizing the inconsistencies upon which the trier of fact could have found the defendants' guilt beyond a reasonable doubt. But in this case, we are asked to review a case in which the victim provided an inconsistent narrative up to and throughout trial, parts of which were in conflict with the medical and investigative records and testimonial evidence, and inconsistent with the physical evidence. Further, the victim pitted her credibility against that of the healthcare professionals, the responding officer, and the detective in claiming she disclosed facts each witness did not report. All of these factors must be considered in our review of the weight of the evidence and the credibility of the state's case in general.

{¶ 148} There may be explanations to harmonize the inconsistencies in the victim's testimony, her reporting, and the physical evidence, but the state has not provided any within the current record. For example, the state claims that the conviction is not against the weight of the evidence because the victim "had DNA of both Tenney and Bergant in various locations on her body" as proof that all four defendants raped the victim. The inference from the DNA evidence relating to Tenney, however, was not of criminal wrongdoing, but of proximity. *McNew*, 2d Dist. Montgomery No. 22902, 2009-Ohio-5531, at ¶ 45 (state failed to prove digital penetration because the victim's DNA found on the defendant's hand could not be identified as vaginal fluid and the victim and defendant resided together, explaining

the presence of the victim's DNA). The forensic evidence identifying Tenney was limited to an epithelial fraction recovered from the victim's hair, a sample that was not identified as seminal material. If the state's argument is taken at face value, the individual vaginal rapes are proven through the inference that one of the defendants committed rape. On this point, it is important to note that none of the defendants were charged with or convicted of conspiracy or complicity. Each of the defendants was convicted as the principal offender for his own actions, a point the state emphasizes in its briefing. The state's argument is not persuasive and does not address the inconsistencies in this record.

**{¶ 149}** It is important to note that there is no assertion that the victim was untruthful, but instead, my decision is a reflection of the overall credibility of the state's case in chief that is based on the totality of the state's evidence and the lack of explanation resolving conflicting testimony. It is not the role of an appellate court to determine whether the events actually transpired, but it is more aptly described as determining whether the state has proven the crime with credible evidence beyond a reasonable doubt in the court of law. "'[M]anifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion * * *." *Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 19. In this case, the state has not presented any explanation harmonizing the inconsistencies with respect to the evidence that directly impact the elements of the crimes for which the defendants were convicted. I would reverse the convictions as being against the weight of the evidence and remand for a new trial.

{¶ 150} In light of the foregoing, I concur with the majority's decision to reverse the imposition of consecutive sentences in this case. At the very least, given the overall lack of overwhelming evidence presented by the state, an argument could be made that it could be found by clear and convincing evidence that the consecutive sentence findings are not supported by the record. The trial court generally found that consecutive service is necessary to protect the public from future crime or to punish the defendants; that the consecutive sentences are not disproportionate to the seriousness of the defendants' conduct and to the danger the defendants pose to the public; and that the defendants' history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by defendant. As the majority points out, none of the defendants has a significant or violent criminal history.

{¶ 151} The same credibility determination that undermined, in my view, the state's case in chief, infected the sentencing decision under R.C. 2929.14(C)(4). For instance, with respect to the finding that consecutive service was not disproportionate to the defendants' conduct, Metz, who by all accounts was the least culpable, received the same consecutive sentences as the rest of the offenders. Further, his conviction especially rested on the most tenuous evidence — his guilt for the rape was not demonstrated until the victim's cross-examination in which she clarified that penetration occurred and the allegation of Metz having committed rape did not occur until trial. Further, the majority's discussion of the defendants' lack of a criminal record supports the need to fully address the consecutive

sentencing review. On this point, I agree with the determination to reverse the imposition of consecutive sentences.

{¶ 152} And finally, I disagree that there is sufficient evidence in support of Browning's conviction for pandering an obscene performance. The majority relies on C.T.'s testimony that he viewed the video recording of the victim performing sexual acts on Tenney and Metz in the back of the car. The state did not rely on that testimony, and in fact, asked the trier of fact to disregard all of C.T.'s testimony as being incredible. Tr. 658:13-21, 659, 661:18-23, 721:9-12, 733:19-20. At trial the state solely relied on the dissemination of the purported video that Browning allegedly made in the apartment as a basis for the pandering conviction.

{¶ 153} The existence of the video recording is not the dispositive issue in this case. The recording itself is more aptly described as "material," which is defined to include a motion picture film or "other tangible thing capable of arousing interest through sight, sound, or touch" including an image or text appearing on a computer monitor or similar display. R.C. 2907.01(J). Pandering obscene material falls under R.C. 2907.32(A)(1). In this case, the indictment was specifically based on R.C. 2907.32(A)(3), which expressly criminalizes the creation, direction, or production of an obscene performance when the offender knows the performance will be publicly presented. Under R.C. 2907.01(K), "performance" is defined as "any motion picture, preview, trailer, play, show, skit, dance, or other exhibition *performed before an audience.*" (Emphasis added.) "Publicly" is defined as "openly. In public, well known, open, notorious, common, or general, as opposed to

private, secluded or secret." *State v. Edmiston*, 8th Dist. Cuyahoga No. 93397, 2010-Ohio-3413, ¶ 24, quoting *Black's Law Dictionary* 1107 (5th Ed.1979).

{¶ 154} Even considering that testimony in a light most favorable to the state, there is no evidence demonstrating that Browning created or produced the obscene performance knowing it would be publicly presented. The "performance" in this case occurred in a private apartment and not before a public audience such that we could conclude that the performance itself was publicly presented. *See Edmiston* (the "performance" of the defendant masturbating in front of women took place in a public elevator open to public viewing). The threat to disseminate the obscene material, i.e., the recording of the "performance," related to proving the elements of a crime for which Browning was not charged. The state's argument is that the video recording itself was publicly disseminated, as demonstrated by the victim's testimony that the unknown persons referenced the video's existence. That is a criminal act under R.C. 2907.32(A)(1), a section not relevant to Browning's conviction for violating R.C. 2907.32(A)(3). I would conclude that there is insufficient evidence to support the pandering obscenity conviction in this case.

{¶ 155} In summary, I believe the defendants are entitled to a new trial based on the majority's application of the incorrect standard of review and I would remand for a new trial on all counts except the pandering conviction as it relates to Browning. I concur with the decision to reverse the imposition of consecutive sentences.