[Cite as *State v. Tate*, 2020-Ohio-3721.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108941 |
| v. | : | |
| CYRUS TATE, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 16, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-634327-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Catherine Coleman, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

LARRY A. JONES, SR., J.:

**{¶ 1}** Defendant-appellant Cyrus Tate ("Tate") appeals his conviction for burglary and vandalism. Finding no merit to the appeal, we affirm.

**{¶ 2}** In 2018, Tate was charged with burglary, a felony of the second degree, and vandalism, a felony of the fifth degree. The matter proceeded to a bench trial at which the following pertinent evidence was presented.

**{¶ 3}** Latasha Lyons ("Lyons") rented a house from Stephen Banks ("Banks") beginning in August 2016. Lyons and her children were listed as the tenants on the lease. Lyons and Tate had children together. Tate was not on the lease and, according to landlord Banks, was not an approved resident. Banks was aware that Tate stored some of his personal belongings at the rental property, but Banks testified he did not know Tate lived there or had a key to the property.

**{¶ 4}** On October 24, 2018, Lyons obtained a civil protection order against Tate. She contacted the Bedford Police Department to assist her in getting Tate to leave the rental property. Bedford Police Officer Shaun Stanton ("Officer Stanton") spoke with Tate about the protection order and told Tate he had to leave the house and only would be allowed to return with a police escort. Officer Stanton further informed Tate he had seven days to retrieve his belongings from the house, but again he had to be with a police escort. Officer Stanton took Tate's house key.

**{¶ 5}** The same day, Lyons contacted Banks to notify him that she and her children would no longer be living at the house and that she had a restraining order against Tate.

**{¶ 6}** When Banks next went to the rental house, he saw that most of the house was empty but some of Tate's belongings were in a room in the basement. Banks began to ready the house for new tenants.

**{¶ 7}** Banks reached out to Tate, so Tate could retrieve his property. According to Banks, he called Tate multiple times, but Tate never called him back. Banks contacted Tate's relatives, and, on November 3, 2018, went to the house to help Tate's sister remove some of Tate's belongings. Banks also sent Tate text messages. Tate answered his texts and told Banks that he knew he was not allowed to come to the property because police had not given him a "green light." Officer Stanton testified that, to his knowledge, Tate never contacted the police about retrieving his property.

**{¶ 8}** At approximately 2 a.m. on November 4, 2018, the police responded to a call of "glass breaking" at the property. When they arrived, officers observed lights on inside the residence and soon saw Tate exiting the home. The police detained Tate, who told officers he had the owner's permission to be there to retrieve his property.

**{¶ 9}** Police observed damage throughout the home and detached garage including numerous holes in the walls; a shattered oven door, glass stove top, and microwave; and a broken window in the detached garage.

**{¶ 10}** According to Banks, the damage to the property was new — he had not observed holes in the wall, a broken window, or shattered glass when he was at his rental property the day before. Police noted no signs of forced entry; apparently Tate had another key to the house, which the police confiscated from him during his arrest. Police found a hammer on the living room floor; Banks testified the hammer did not belong to him and he had never seen it before.

**{¶ 11}** After the state rested its case, defense counsel moved for acquittal pursuant to Crim.R. 29. The trial court granted the motion as to burglary, a felony of the second degree, and allowed the case to proceed on the lesser-included offense of burglary, a felony of the third degree. The court subsequently found Tate guilty of burglary and vandalism. The court sentenced Tate to 12 months for burglary and ten months for vandalism to be served concurrently for a total of 12 months in prison and ordered Tate to pay $950 in restitution to Banks.

**{¶ 12}** Tate filed a timely appeal and raises the following assignments of error for our review:

> I. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

> II. The convictions were against the manifest weight of the evidence.

> III. The trial court erred by failing to merge all allied offenses of similar import and by imposing separate sentences for allied offenses which violated appellant's state and federal rights to due process and protections against double jeopardy.

**{¶ 13}** In the first assignment of error, Tate claims that his convictions for burglary and vandalism were not supported by sufficient evidence.

**{¶ 14}** When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime proven beyond a reasonable doubt."

*Id.*

{¶ 15} Tate contends that there was insufficient evidence to support his burglary conviction because the state failed to prove that he broke into the rental property and damaged the property.

{¶ 16} Tate was found guilty of one count of burglary in violation of R.C. 2911.12(A)(3), which provides that

> [n]o person, by force, stealth, or deception, shall do any of the following: * * * trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense.

{¶ 17} An "occupied structure" is defined as "any house, building * * * or any portion thereof" that "is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present * * *." R.C. 2909.01(C)(1). A trespass is committed when a person knowingly enters the land or premises of another without privilege to do so. *See* R.C. 2911.21(A)(1).

{¶ 18} Banks testified that his house had been rented out and occupied by tenants since 2007. Most recently, Banks had leased the house to Lyons who had been living at the property since 2016. After learning that Lyons had left the property, Banks quickly began cleaning the property and looking for new tenants; he had new tenants set to move in soon.

**{¶ 19}** On October 24, 2018, police informed Tate that he could no longer stay at the property and was only able to return with a police escort. Hours before his arrest, Tate admitted in two text messages to Banks that he was not supposed to be at the rental property. Although Tate told police he had the owner's permission to be at the house, Banks testified that he had not given Tate permission. Police responded to a call for glass breaking at the property and when they arrived on scene, they observed Tate walking out of the house. Police then observed broken glass in the house and a broken window in the detached garage. There were multiple holes throughout in the walls of the house, damage to kitchen appliances, and police recovered a hammer in the living room. Banks testified that there was no damage to the house when he was there the day before, and he had never before seen the hammer.

**{¶ 20}** We further note that the trial court granted Tate's Crim.R. 29 motion for acquittal on second-degree felony burglary and proceeded on the lesser offense of third-degree felony burglary because the state did not present sufficient evidence to establish the property as a "temporary habitation" to qualify as a violation of R.C. 2909.11(A)(2).

**{¶ 21}** Thus, viewing this evidence in the light most favorable to the state, there is sufficient evidence to determine that Tate was the person who caused the property damage in that (1) there was no damage to the property when the landlord was there; (2) Tate was the only individual found at the residence at 2:00 a.m. after police responded to a call for glass breaking; and (3) police observed broken glass

and a damaged garage window. There is also sufficient evidence that Tate's intent upon entering the home was criminal and that he committed the crime of burglary.

{¶ 22} Tate also contends that there was insufficient evidence to support his vandalism conviction because the state failed to prove that he caused serious physical harm to the property. Fifth-degree felony vandalism, as defined by R.C. 2909.05(A), provides that "no person shall knowingly cause serious physical harm to an occupied structure or any of its contents." Serious physical harm is defined as "physical harm to property that results in loss to the value of the property of one thousand dollars or more." R.C. 2909.05(F)(2).

{¶ 23} Banks testified about the cost of repairing the damage to the home and replacing the damaged appliances, as well as the loss of rental income during the three weeks required to make the repairs. Tate claims that he did not cause serious physical harm to the property because Banks sought less than $1000 in restitution.

{¶ 24} We note that Banks repaired much of the damage himself, saving himself, and ultimately Tate, to whom Tate owes Banks restitution as part of his sentence, money. But Banks testified extensively as to the amount of damage done to his rental property and that he lost three weeks of rental income on the property because he had to make repairs to the property.

{¶ 25} Banks testified he lost about $650 in rental income due to the time it took for him to make repairs to the property. He also testified that he received a $300 estimate for cleaning but saved money by paying his mother $200 to clean the

house.  He received a bid for $700 to do repairs to the house but did the work himself and paid $150 for materials.  In addition, Banks testified that he paid $199 plus tax for a new microwave, $350 for a new oven, $40 - $50 for ceiling tiles, and $50 for new locks for the house.  Although Tate may have saved money by hiring his mother to clean and by doing the repair work himself, we find sufficient evidence of serious physical harm based on the damage to the rental property and the loss in rental income to satisfy the "serious physical harm" requirement under R.C. 2909.05(F)(2).

{¶ 26} In light of the above, the state presented sufficient evidence to support Tate's conviction for fifth-degree felony vandalism.

{¶ 27}  The first assignment of error is overruled.

{¶ 28}  In the second assignment of error, Tate contends that his convictions were against the manifest weight of the evidence.  Determinations of credibility and weight of the testimony are primarily for the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  The jury, or the court in a bench trial, may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony."  *State v. Metz*, 8th Dist. Cuyahoga Nos. 107212, 107246, 107259, and 107261, 2019-Ohio-4054, ¶ 70, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).  Therefore, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony."

*Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at *id.*, quoting *Martin* at *id.*

{¶ 29} Tate asserts his convictions are against the manifest weight of the evidence because he thought he had a right to be at the property, had a key to the property, and there was no evidence he damaged the property.

{¶ 30} It was within the province of the trial court, as the trier of fact, to resolve conflicts in the evidence. In resolving these conflicts, the trial court was able to view photos of the damage and heard testimony from Banks and Officer Stanton. In view of its verdict, the trial court did not believe what Tate told police, but also acquitted Tate of second-degree felony burglary. Upon reviewing the entire record, we find that the trial court's verdict was not against the manifest weight of the evidence. This is not an exceptional case in which the evidence weighs heavily against the conviction.

{¶ 31} The second assignment of error is overruled.

{¶ 32} In the third assignment of error, Tate contends that the trial court erred by not merging his burglary and vandalism convictions.

{¶ 33} We apply a de novo standard of review when determining whether two or more offenses are allied offenses of similar import. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However,

> [w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his [or her] conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(B).

{¶ 34} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: (1) the offenses are dissimilar in import or significance — in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation. *Id.* at ¶ 25. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses

involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus. Therefore, in determining whether offenses are allied under R.C. 2941.25, courts are instructed to consider three separate factors — the conduct, the animus, and the import. *Id.* at paragraph one of the syllabus.

{¶ 35} A defendant's failure to object to an alleged allied offense error at the trial-court level results in a waiver of the claim on appeal absent plain error. *State v. Comen*, 50 Ohio St.3d 206, 211, 553 N.E.2d 640 (1990). Moreover, "a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3.

{¶ 36} Tate contends that his convictions should have merged because he entered the house unlawfully to commit the crime of vandalism. We disagree.

{¶ 37} Tate relies on this court's holding in *State v. McCarty*, 2015-Ohio-4695, 47 N.E.3d 515 (8th Dist.), where this court found that the appellant's burglary and vandalism convictions merged when the appellant broke into his former girlfriend's home and caused structural damage to the door. This court found that the burglary and vandalism consisted of a single action and were committed with the same animus. *Id.* at ¶ 23.

{¶ 38} In this case, Tate had personal property in the house and told the police he was at the house to retrieve his belongings. He may have initially entered the house unlawfully — he had a key but was not permitted to be in the house — to

gather his belongings and then separately formed the intent to vandalize the house and garage. Moreover, unlike *McCarty*, the vandalism charge was not premised on the harm Tate did to the rental property when he trespassed into the house. Again, Tate entered the property using a key; there were no signs of forced entry. The vandalism charge was based on the damage he did to the house once inside it and to the garage — acts altogether separate from entering the house unlawfully.

{¶ 39} The trial court did not commit plain error when it did not merge Tate's burglary and vandalism convictions. The third assignment of error is overruled.

{¶ 40} There was sufficient evidence to support Tate's convictions for burglary and vandalism and his convictions were not against the manifest weight of the evidence. The trial court did not commit plain error when it did not merge his convictions as allied offenses of similar import.

{¶ 41} The assignments of error are overruled. Judgment affirmed.

The court finds there were reasonable grounds for this appeal.

It is ordered that appellee recover from appellant costs herein taxed.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

LARRY A. JONES, SR., JUDGE

ANITA LASTER MAYS, P.J., CONCURS;
FRANK D. CELEBREZZE, JR., J., CONCURS
WITH SEPARATE OPINION

FRANK D. CELEBREZZE, JR., J., CONCURRING:

{¶ 42} I concur with the majority's opinion and resolution of this case. I respectfully write separately, however, to express my opinion that the amount of lost rental income cannot be considered in determining whether the "serious physical harm" element of the vandalism charge was met.

{¶ 43} As noted in the majority's opinion, a vandalism conviction under R.C. 2909.05 requires a showing of "serious physical harm," that is defined as "physical harm to property that results in loss to the value of the property of one thousand dollars or more." R.C. 2909.05(F)(2). R.C. 2909.11 outlines the method for determination of property value or amount of physical harm for several crimes, including vandalism. Subsection (B)(2) of this statute states that the amount of physical harm involved for the crime of vandalism is "the reasonable cost of *restoring the property*." (Emphasis added.) Accordingly, the statute does not provide for the loss of rental income to be considered in determining whether the $1000 threshold has been met.

{¶ 44} The outcome of this matter is the same. The state presented sufficient evidence regarding the amounts to repair the damage to the property, which

included replacement of certain appliances, cleaning, and construction repairs, the total of which exceeded $1,000. The trier of fact therefore still could have found serious physical harm to the property beyond a reasonable doubt without consideration of the loss of rental income.