[Cite as *State v. Browning*, 2023-Ohio-1887.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellant,           :

                                          Nos. 111856, 111857,

    v.                             :          111858, and 111859

JAUSTIN BROWNING, ET AL.,                :

    Defendants-Appellees.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 8, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-17-618532-A, CR-17-618532-C, CR-17-618532-D,
and CR-17-618532-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, *for appellant.*

Kimberly Kendall Corral, *for appellee* Jaustin Browning.

Russell S. Bensing, *for appellee* Anthony Metz.

Gina Kuhlman, *for appellee* Richard Tenney.

Squire Patton Boggs LLP, Colter L. Paulson, and Steven A. Delchin, *for appellee* Anthony Bergant.

LISA B. FORBES, J.:

{¶ 1} The state of Ohio (the "State") appeals from the trial court's journal entry granting Jaustin Browning ("Browning"), Anthony Metz ("Metz"), Richard Tenney ("Tenney"), and Anthony Bergant's ("Bergant") (collectively "Defendants") postconviction-relief petition. After reviewing the facts of the case and pertinent law, we affirm the lower court's judgment.

## I.    Procedural History

{¶ 2} On April 3, 2018, after a bench trial, Judge Joseph D. Russo[1] ("Judge Russo") found the Defendants guilty of rape, kidnapping, and other offenses associated with the alleged sexual assault of T.B. On May 3, 2018, Judge Russo sentenced Browning to 31 years in prison, Metz to 15 years in prison, Tenney to 30 years in prison, and Bergant to 30 years in prison. Pertinent to this appeal, Judge Russo appointed attorney Susan Moran ("Moran") to represent Bergant in any subsequent appellate proceedings.

{¶ 3} On July 2, 2019, the Defendants filed their postconviction-relief petition, alleging that the trial court "was not an impartial finder of fact, and this bias compromised [their] right to a fair trial so as to render the judgment void or voidable under the Ohio Constitution and the Constitution of the United States." Moran, along with the Defendants' trial counsel Jeff Richardson ("Richardson"), Jeffrey P. Saffold ("Saffold"), Brian McGraw ("McGraw"), and Myriam Miranda

---

[1] Judge Russo passed away unexpectedly on October 2, 2021.

("Miranda"), submitted affidavits to the court to support the postconviction-relief petition.

{¶ 4} Specifically, the Defendants alleged that, during trial, Judge Russo had a conversation with his wife, "who is a supervising social worker at MetroHealth where [T.B.] was treated." Judge Russo's wife knew about this case and allegedly said to him, "You are not going to acquit those animals." Judge Russo allegedly "responded to his wife in a manner to suggest that of course he would not."

{¶ 5} Judge Russo talked to Moran about this conversation. It was not until after her appointment as Bergant's appellate counsel that Moran realized the connection and met with the public defender's office to "jointly [try] to come up with a way to undo this terrible, terrible tragedy of justice." Judge Russo recused himself from hearing the postconviction-relief petition, and this case was assigned to a different judge.

{¶ 6} In October 2019, the Defendants' convictions were affirmed on direct appeal, but this court reversed the consecutive aspect of the Defendants' prison sentences and remanded for resentencing. *State v. Metz*, 2019-Ohio-4054, 146 N.E.3d 1190 (8th Dist.) ("*Browning I*").[2]

{¶ 7} On June 29, 2020, the trial court granted the postconviction-relief petition without holding a hearing. The State appealed, and this court reversed and remanded the case to the trial court "to hold an evidentiary hearing." *State v.*

_____

[2] The Defendants' cases were consolidated on appeal, and although the direct appeal was captioned *State v. Metz*, for ease of discussion, we refer to it as *Browning I*.

*Tenney*, 8th Dist. Cuyahoga Nos. 109797, 109798, 109799, and 109800, 2021-Ohio-3676, ¶ 25 ("*Browning II*").[3]

{¶ 8} On remand, the court held a four-day evidentiary hearing on the postconviction-relief petition. On July 18, 2022, the court issued a journal entry granting the postconviction-relief petition and finding that the Defendants' constitutional rights were violated because: (1) the factfinder was biased; (2) the "jury trial waiver was not knowingly, intelligently, and voluntarily made"; and (3) the factfinder "applied a standard of proof less than beyond a reasonable doubt." Specifically, the court "found the witnesses to be credible and [gave] great weight, especially, to the testimony of those lawyers directly involved in the trial of this case and its subsequent appeal." The court further found as follows:

> For a judge with a well-known reputation as a lenient sentencer to act as he did in a case where the evidence was widely acknowledged to be weak, under the very troubling circumstances testified to by trial and appellate counsel, reasonably gives rise to a concern that the trial judge convicted the defendants and then imposed extraordinarily and uncharacteristically harsh sentences for reasons other than the facts and the law — improper reasons, apparently at the behest, whether real or perceived, of his wife.
>
> * * *
>
> Defendants have persuaded the court than an unfortunate but reasonable showing of bias, prejudice or partiality by the judge in the bench trial in this case has been made * * *.

---

[3] For ease of discussion, we refer to *State v. Tenney* as *Browning II*.

{¶ 9} It is from this order that the State appeals raising one assignment of error for our review: "The trial court erred in granting the petition for post-conviction relief."

## II. Postconviction-relief petition Hearing Testimony

### A. Moran

{¶ 10} Moran testified that she was friends with Judge Russo "pretty much since he had been elected," she appeared before him on multiple occasions, and he "would often assign [her] cases for appellate purposes." In her opinion, Judge Russo had a reputation as a fair judge and a "lenient sentencer."

{¶ 11} In March or April 2018, while this case was pending in the trial court, Moran had a "social" conversation with Judge Russo in his chambers. Moran testified that she recalled being on the 22nd floor of the Justice Center, which is where Judge Russo's chambers was located. Specifically, Moran testified as follows:

> So, on this particular day, I can't recall exactly why I was back there, but I could have had a case with [another judge], or anybody, or quite frankly a different case on a different floor and just decided to go and say "hi."
>
> * * *
>
> And, again, this happened so long ago, I can't be entirely accurate as to why I was up there, but I know for certain that I was up there. And I know the impetus of this was a social interaction in the general * * * area between [Judge Russo and another judge's chambers].
>
> And at one point, Judge Russo says, hey, come in here. I have to tell you a story. I said, fine.
>
> And he would often do that. He would entertain and tell us stories. He was a pretty funny person.

He called me back in chambers and even closed the door.

{¶ 12} According to Moran, Judge Russo said to her, "My wife happens to be working at Metro Hospital, and she became familiar with this case because the alleged victim came in for treatment." Moran further testified as follows:

> My impression was something to the effect of that she [Judge Russo's wife] was horrified about what she believed this victim had gone through.
>
> And she said to the Judge, privately, you are not going to let these guys go free, are you? Which he then said some — he may have reiterated some disparaging words, like, sons of bitches, or animals, something to that end.
>
> He started laughing, kind of like can you believe? Oh, my gosh. What a coincidence. This is crazy. It was almost, like, a tacit acceptance of her concern * * * in that he never outright said, of course, I'm not going to do that. Of course, I'm going to find them guilty. * * *

{¶ 13} Moran testified that she "held" this information, although she was "disturbed" that Judge Russo was presiding over this trial considering "this direct link to the case." Moran "kind of left it alone and kind of kept it to [herself] until [she] received an assignment for an appeal." As Moran started reading the trial transcript in the case at hand, she "started feeling horrified."

> So I said, Oh, my gosh, and this is my first red flag. Then I started reading the transcript, and reading the testimony of this alleged victim, and just being sickened by the conviction, and sickened by the amount of time that these guys received. * * * Judge Russo never hands out a 30-year sentence in cases like rape in my experience, certainly that wasn't his reputation.
>
> * * *
>
> And when I had written the appeal, I actually had done a spreadsheet of inconsistencies in the alleged victim's story. And it was so apparent to me that this woman was lying that I couldn't help but believe that

this communication that he had with his wife had an input and a direct impression and a direct bias on his judgment.

{¶ 14} Moran met with attorneys at the public defender's office and apprised them of the situation. Moran further testified as follows:

> I said [to the public defender's office] that I did not want to file this affidavit. And they knew this was the very last thing in our arsenal. * * * I did not want to ruin my friendship with him. * * *

> But most importantly, it was going to ruin his career, in my opinion, or at least likely ruin his career that he revealed that his wife was having this conversation during the middle of trial and that the consequence was this ridiculous sentence and conviction. One weighs against the other.

{¶ 15} During Moran's testimony, she made it clear that she did not write the affidavit that was attached to the postconviction-relief petition, and that, if she had, she would have chosen different words at times. For example, Moran testified as follows: "And I'm not entirely comfortable with Paragraph 7 * * * [w]here it says the wife says, you are not going to acquit those animals, or something to that effect. I wouldn't have written it with quotation marks. But again, I cannot specifically remember what he said, but that was the spirit of it."

{¶ 16} The prosecutor asked Moran, "Not acquit those animals, right? That did or did not happen explicitly?" Moran answered, "It did not happen explicitly * * *. I think that I explained that about five different ways. * * * I thought it was son of a b***h. Sons of b*****s, to be honest with you. That's what I thought it was."

{¶ 17} Subsequently, Moran spoke to Judge Russo about the situation, telling him that he put her in a "terrible" position where she could "make no right turn." According to Moran, Judge Russo never denied that the conversation at issue

took place.  "He never denied it.  He tried to couch it in terms that it didn't have an impact on his decision.  But he never denied it."  Specifically, Moran testified as follows:

> And I said, You f*****d up.  I said, These boys are innocent, and you f*****d up.  And he said, You didn't put that in your brief, did you?

> I'm like, No, I did not put that in my brief.  He said, Oh, good.  You know, that conversation with my wife didn't mean anything.  It didn't have any effect on me.

> I said that you put me in this terrible position.  Not only did you have this conversation with me, you assigned me the appeal.  Now I've got an ethical duty and a moral duty to save these kids.

> * * * He was concerned.  He was worried about where this was going to go.  And I think that's why he characterized his discussion with his wife as being meaningless and couch[ed] it more of, oh, coincidental.

{¶ 18}  Asked how this situation affected her relationship with Judge Russo, Moran answered, "Almost immediately he recused himself from all open cases that I had before him.  He would — I know that I avoided contact with him.  I think that he did the same."

**B. Defendants' Trial Attorneys**

{¶ 19}  Saffold, Miranda, and McGraw[4] testified at the postconviction-relief petition hearing that they recommended their clients proceed with a bench trial, rather than a jury trial, in the instant case for two reasons.  First, the court, as the factfinder, would be better able than a jury, as the factfinder, to distinguish what may be seen as immoral behavior from illegal behavior.  It is undisputed that the

---

[4] Richardson did not testify at the postconviction-relief petition hearing.

allegations in the instant case concerned "group sex," and the paramount issue at trial concerned T.B.'s credibility. *See generally Browning I.* Second, the trial attorneys testified that they recommended waiving a jury trial because Judge Russo specifically would be the factfinder. Saffold testified that he "thought it would be a case that Judge Russo would see as having reasonable doubt." Miranda testified that "[t]his is a case which we perceive to [be a] very good case for the defense, that would be tried efficiently * * *." McGraw testified that Judge Russo had a reputation as being "probably a little on the lighter side of the center."

{¶ 20} Saffold and Miranda testified that, at sidebar early in trial, Judge Russo stated that his wife worked at MetroHealth, where T.B.'s rape kit was conducted, but that his wife had nothing to do with this case. McGraw testified that he had no recollection of this occurring.

{¶ 21} Saffold, Miranda, and McGraw consistently testified that they thought the trial was going well for the defense, particularly because, in their opinions, the victim's inconsistent testimony led to credibility issues. However, Saffold testified that he "began to see [things] turn sour in the middle of trial," and "it began to appear to me that the Court already had made * * * up his mind."

{¶ 22} The three trial attorneys testified that they were surprised at the guilty verdict and shocked at the lengthy prison sentences. Saffold requested that Judge Russo recuse himself at the sentencing hearing, stating that the prison sentences were "extreme." Miranda objected at the sentencing hearing and testified that this was the "worst moment" in her career.

{¶ 23} Saffold, Miranda, and McGraw testified consistently that, at the time of trial, they did not know of Judge Russo's conversation with his wife. Had they known, they would have done things differently, including not waiving the right to a jury trial, asking Judge Russo to recuse himself, and requesting a mistrial.

### C. Former Public Defender

{¶ 24} Mark Stanton ("Stanton") testified that he was the Cuyahoga County Public Defender from May 2017 through January 1, 2021. In June 2019, Moran's conversation with Judge Russo was brought to his attention, and he met with Judge Russo. According to Stanton, Judge Russo acknowledged having a conversation with his wife about the case at hand between the parties' final arguments and the verdict. Judge Russo indicated that his wife "knew about the case," and he told her "this was a difficult decision." His wife replied, "That doesn't mean they're not guilty." Stanton testified that "based certainly on that conversation primarily," he approved filing the postconviction-relief petition and it was "in the best interest of the Court and certainly for the defendants that [Judge Russo] would consider recusing himself."

### D. Robert Glickman

{¶ 25} Robert Glickman ("Glickman") testified on behalf of the State that he is an attorney and former judge. Glickman was "very close friends" with Judge Russo, and he represented Judge Russo in this matter, particularly in the event Judge Russo was required to testify. On October 8, 2019, Glickman met with Judge Russo and a representative from the prosecutor's office regarding the

postconviction-relief petition and accompanying affidavits. According to Glickman, Judge Russo did not deny having a conversation with his wife about this case but "said that he would never allow a comment from his wife to affect how he would handle any case." Judge Russo also took issue with Moran's recollection of his response to his wife. Moran stated in her affidavit, "Judge Russo indicated that he had responded to his wife in a manner to suggest that of course he would not" acquit the Defendants. Judge Russo told Glickman that "that did not happen."

## III. Law and Analysis

### A. Postconviction-Relief Petitions

{¶ 26} Postconviction relief is a civil collateral attack on a criminal judgment. *State v. Curry*, 8th Dist. Cuyahoga No. 108088, 2019-Ohio-5338, ¶ 12. "Postconviction review is not a constitutional right but, rather, is a narrow remedy that affords a petitioner no rights beyond those granted by statute." *Id.*, citing *State v. Calhoun*, 86 Ohio St.3d 279, 281-282, 714 N.E.2d 905 (1999). R.C. 2953.21 allows convicted criminal defendants to file a petition requesting that the trial court vacate its judgment on the grounds that there was a denial or infringement of his or her constitutional rights rendering the judgment void or voidable. R.C. 2953.21(A)(1)(a)(i).

{¶ 27} "It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34.

> [T]he term "biased or prejudiced," when used in reference to a judge
> before whom a cause is pending, implies a hostile feeling or spirit of ill

will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.

*State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 469, 132 N.E.2d 191 (1956).

{¶ 28} The Ohio Supreme Court has recently reaffirmed the importance of an unbiased judge.

[I]t is imperative to remove any hint or question of an appearance of bias and to ensure to the parties and the public the *unquestioned* neutrality of an impartial judge. This court long ago noted that "'[n]ext in importance to the duty of rendering a righteous judgment is that of doing it in such a manner as will beget no suspicion of the fairness or integrity of the judge.'" *State ex rel. Pratt v. Weygandt,* 164 Ohio St. 463, 471, 132 N.E.2d 191 (1956), quoting *Haslam v. Morrison*, 113 Utah 14, 20, 190 P.2d 520 (1948).

*State v. Weaver (In re Cottrill)*, Slip Opinion No. 2022-Ohio-4800, ¶ 16.

{¶ 29} In *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937, N.E.2d 97, ¶ 49, the Ohio Supreme Court clarified that if a trial judge forms an opinion based on evidence introduced at, or events that occurred during, the court proceeding at issue, the judge's opinion does not rise to the level of judicial bias unless it shows "'a deep-seated favoritism or antagonism that would make fair judgment impossible.'" (Quoting *Liteky v. U.S.*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)).

{¶ 30} The Ohio Supreme Court has acknowledged the "extrajudicial source" doctrine, which stands for the proposition that "the only 'bias' recognized as improper is that which stems from a source outside the judicial proceedings giving rise to the claim of bias." *Cleveland Bar Assn. v. Cleary*, 93 Ohio St.3d 191, 202, 754 N.E.2d 235 (2001), quoting *Liteky at* 550-551.

**B. Standard of Review**

{¶ 31} A "trial court's decision regarding a postconviction petition filed pursuant to R.C. 2953.21 will be upheld absent an abuse of discretion when the trial court's finding is supported by competent and credible evidence." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 60. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**C. Analysis**

{¶ 32} In the case at hand, the State argues that the trial court erred by granting the postconviction-relief petition for four reasons: (1) Defendants "failed at the evidentiary hearing to prove that Judge Russo engaged in a *substantive* communication with his spouse about the case" over which he was presiding (emphasis sic); (2) Defendants failed to show "that Judge Russo allowed his spouse to improperly influence the outcome of trial"; (3) Defendants failed to overcome "the presumption that Judge Russo acted without bias"; and (4) "[T]he trial court made its findings without an independent record of the trial court transcripts or the proceedings below and essentially made its finding of potential bias on the opinions of partial witnesses — namely attorneys who represented the defendants at trial."

**1. The Conversation at Issue was Substantive in Nature**

{¶ 33} "In examining a claim of prejudice, the court must consider the nature and content of the communication. * * * [P]rejudice * * * does not arise if the court's

communication * * * is not substantive in nature." *State v. DiPietro*, 10th Dist. Franklin No. 09AP-202, 2009-Ohio-5854, ¶ 17. Extrajudicial conversations concerning "legal issues involved in the case, applicable law, a charge to the jury, or a fact in controversy could potentially involve substantive matters." *Orenski v. Zaremba Mgmt. Co.*, 8th Dist. Cuyahoga No. 80402, 2002-Ohio-3101, ¶ 27.

{¶ 34} In the case at hand, the undisputed evidence shows that Judge Russo had a brief conversation with his wife about whether he would convict or acquit the Defendants. Judge Russo then told Moran about this conversation. Moran and Stanton testified that Judge Russo admitted this conversation took place. Glickman testified that Judge Russo admitted a conversation took place, but Judge Russo took issue with Moran's characterization of his response to his wife. Regardless, a criminal defendant's guilt is a legal issue and is substantive in nature. *See Stone v. Powell*, 428 U.S. 465, 490, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) ("[T]he ultimate question of guilt or innocence * * * should be the central concern in a criminal proceeding.").

{¶ 35} Accordingly, there is competent and credible evidence in the record to support the conclusion that the conversation at issue was substantive in nature.

### 2. The Conversation at Issue Improperly Influenced, or Appeared to Influence, the Outcome of Trial; The Presumption Against Bias was Overcome

{¶ 36} We address these two sub-issues together because they are interrelated.

{¶ 37} In the case at hand, the trial court acknowledged that there was a presumption against bias in determining whether to grant the Defendants' postconviction-relief petition. "'Bias or prejudice on the part of a judge will not be presumed. In fact, the law presumes that a judge is unbiased and unprejudiced in the matters over which he presides, and bias or prejudice must be strong enough to overcome the presumption of his integrity.'" *State v. Baker*, 25 Ohio Misc.2d 11, 12, 495 N.E.2d 976 (C.P.1984), quoting 48A *Corpus Juris Secundum*, Judges, Section 108, at 731 (1981).

{¶ 38} The Ohio Supreme Court has held that the "appearance of bias or prejudice must be compelling to overcome" this presumption against bias. *In re Disqualification of Olivito*, 74 Ohio St.3d 1261, 1263, 657 N.E.2d 1361 (1994). Furthermore, "dissatisfaction or disagreement with a judge's rulings of law are legal issues subject to appeal. A judge's opinions of law, even if later found to be erroneous, are not by themselves evidence of bias or prejudice and thus are not grounds for disqualification." *In re Disqualification of Corts*, 47 Ohio St.3d 601, 602, 546 N.E.2d 928 (1988).

{¶ 39} In the case at hand, Moran testified that her impression of Judge Russo's response to his wife's comment was "a tacit acceptance of her concern" that he convict the Defendants. Moran also testified that, in her role as Bergant's appellate attorney, she found T.B.'s testimony to be inconsistent. "And it was so apparent to me that this woman was lying that I couldn't help but believe that this

communication that [Judge Russo] had with his wife had an input and a direct impression and a direct bias on his judgment."

{¶ 40} Saffold, Miranda, and McGraw testified that they thought the trial was going well for the Defendants, particularly based on T.B.'s inconsistent testimony, and that they were surprised when Judge Russo found them guilty. Saffold testified that he thought Judge Russo had made up his mind to convict the Defendants at a certain point during trial. Saffold's testimony that it appeared to him "in the middle of trial" that Judge Russo "already had made up * * * his mind" demonstrates that the court had a "fixed anticipatory judgment" regarding the Defendants' guilt. *See Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, at ¶ 48.

{¶ 41} Moran, Saffold, Miranda, McGraw, Stanton, and Glickman testified that Judge Russo had a reputation as a "lenient sentencer" and that the sentences he imposed on the Defendants were unusually harsh for him or any judge in the area.

{¶ 42} Saffold, Miranda, and McGraw testified that, had they known about Judge Russo's conversation with his wife prior to trial, they would have done things differently, including trying the case to a jury, rather than the bench; asking Judge Russo to recuse himself; and requesting a mistrial. Stanton testified that, after discussing this situation with Judge Russo, he decided to file the postconviction-relief petition.

{¶ 43} The only evidence in the record that challenges the testimony from the Defendants' witnesses is Glickman's testimony that Judge Russo told him that "he would never allow a comment from his wife to affect how he would handle any case." Glickman also testified that Judge Russo took issue with the portion of Moran's affidavit stating that "Judge Russo indicated that he had responded to his wife in a manner to suggest that of course he would not" acquit the Defendants. Specifically, Glickman testified that Judge Russo told him "that did not happen."

{¶ 44} Upon review, we find that the evidence in the record overcame the presumption against bias. Judge Russo's conversation with his wife and subsequent recounting of it to Moran improperly influenced, or appeared to improperly influence, the outcome of trial. Given the evidence presented, we cannot say that the trial court's conclusion in this regard amounts to an abuse of discretion.

### 3. The Trial Court Properly Relied on Evidence Presented at the Postconviction-relief petition Hearing

{¶ 45} In *Browning II*, this court remanded this case to the trial court to conduct an evidentiary hearing on the Defendants' postconviction-relief petition. At this hearing, several witnesses testified, and seven exhibits were admitted into evidence, including three of the affidavits that were attached to the Defendants' postconviction-relief petition and portions of the transcripts from trial and the sentencing hearing.

{¶ 46} The merits of the Defendant's trial were reviewed at length in *Browning I* and, although this court affirmed the convictions, there was a lead opinion and two concurring-in-part-and-dissenting-in-part opinions. "This case, in

our opinion, was not a 'slam dunk' for the state * * *. There were credibility issues with T.B., the victim, as well as with [other] defense witnesses." *Id.* at ¶ 108. Additionally, the *Browning I* Court reversed the imposition of consecutive sentences, finding that "the record does not support the trial court's findings for the imposition of consecutive sentences under R.C. 2929.14(C)(4)" and "to impose such a severe punishment on a case such as this is troubling." *Id.* at ¶ 110, 108.

{¶ 47} The State argues on appeal that "the evidentiary hearing disproved the facts alleged in * * * Moran's affidavit." Specifically, the State argues that Moran's statement in her affidavit that "Judge Russo indicated that he had responded to his wife in a manner to suggest that of course he would not" acquit the Defendants conflicts with her hearing testimony that Judge Russo's response to his wife "was more of a tacit, almost like a gesturing. I don't want to make it seem like he said to me, I told my wife, of course, I would not find these guys not guilty."

{¶ 48} Upon review, we do not see these statements as conflicting or inconsistent. Rather, Moran's testimony clarifies and expands on the reasoning behind the statement she made in her affidavit.

{¶ 49} The State also argues that the decision to grant the Defendants' postconviction-relief petition was "troubling," because "the trial court did not engage in any analysis of the trial court record and did not point to any statements made by the trial court that would indicate judicial bias." The allegations of bias or prejudice in the case at hand are not based on comments the judge made during trial

or from the bench. The allegations at issue concern "extrajudicial" conversations, which necessarily would not be found in the record.

{¶ 50} The only issue before the trial court at the postconviction-relief petition evidentiary hearing was whether Judge Russo was biased against the Defendants. The only evidence presented on this issue was presented in the postconviction-relief petition motion and at the postconviction-relief petition evidentiary hearing. In *Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, at ¶ 55, the Ohio Supreme Court held that a "postconviction judge sees and hears the live postconviction witnesses, and he or she is therefore in a much better position to weigh their credibility than are the appellate judges."

{¶ 51} Ohio courts have long held that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). *See also Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984) ("The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.").

{¶ 52} In the case at hand, the trial court made a credibility determination regarding the witness testimony at the postconviction-relief petition hearing. All the defense witnesses were officers of the court who testified under oath that Judge Russo's extrajudicial conversation with his wife appeared to affect his judgment.

The State's witness Glickman, who also is an officer of the court, testified under oath that Judge Russo denied responding to his wife's comment in the way that Moran described. In granting the postconviction-relief petition, the trial court found the defense witnesses' testimony more credible.

{¶ 53} We stress that not every extrajudicial conversation involving a judge, in and of itself, is evidence of bias. However, here, when Judge Russo's extrajudicial conversation with his wife and his informing Moran of this conversation are viewed against the backdrop of a bench trial riddled with inconsistent testimony from the victim and an unusually harsh prison sentence, it becomes apparent that the trial court's decision to grant the Defendants' postconviction-relief petition is supported by competent and credible evidence in the record. Therefore, we cannot say that the trial court abused its discretion, and the State's sole assignment of error is overruled.

{¶ 54} We need not address the trial court's two other reasons for granting the postconviction-relief petition, i.e., the jury waiver and the standard of proof.

{¶ 55} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
EMANUELLA D. GROVES, J., CONCUR